C. Clyde ATKINS et al.,

v.

The UNITED STATES.

Louis C. BECHTLE et al.,

v.

The UNITED STATES.

Ruggero J. ALDISERT et al.,

v.

The UNITED STATES.

Nos. 41–76, 132–76 and 357–76.

United States Court of Claims.

May 18, 1977.

---

1030

**1032**

Arthur J. Goldberg, Washington, D. C.,
atty. of records, for plaintiffs. Stephen G.
Breyer, Cambridge, Mass., and Kevin M.
Forde, Chicago, Ill., of counsel.

Asst. Atty. Gen. Rex E. Lee, Washington,
D. C., for defendant. James F. Merow and
Richard J. Webber, Washington, D. C., of
counsel.

Cornelius B. Kennedy, Washington, D. C.,
filed a brief for Nelson A. Rockefeller,
President of the United States Senate, as
amicus curiae. Kennedy, Webster & Gard-
ner, Washington, D. C., of counsel.

Eugene Gressman, Washington, D. C.,
filed a brief for Frank Thompson, Jr.,
Chairman, Committee on House Adminis-
tration, United States House of Representa-
tives, as amicus curiae. Arthur S. Miller,
Washington, D. C., of counsel.

Francis M. Wheat, Los Angeles, Cal.,
filed a brief for Los Angeles County Bar
Association as amicus curiae. John J.
Quinn, Jr., Samuel L. Williams, John D.
Taylor, David Ellwanger, and Brigitta B.
Troy, Los Angeles, Cal., of counsel.

Before COWEN, Senior Judge, DAVIS,
Judge, SKELTON, Senior Judge, and
NICHOLS, KASHIWA, KUNZIG and
BENNETT, Judges, en banc.

## OPINION

**PER CURIAM:**

In these three consolidated cases, 140 United States circuit and district judges have sued the Government to recover additional compensation they allege is due them under the Constitution of the United States for their services as federal judges since March 15, 1969.

Plaintiffs allege that each of them has been appointed to his present office pursuant to article III, section 2, of the Constitution, and that each of them has served in the office to which he was appointed during all or a part of the period commencing March 15, 1969, and extending up to the present time. These suits have been filed in this court under the Tucker Act, 28 U.S.C. § 1491 (1970), to recover money damages plaintiffs allege are presently due them by the Government. Plaintiffs' petitions contain two counts, which may be described briefly as follows:

(2) *Count I:* Plaintiffs allege that article III, section 1, of the Constitution, prohibits the executive and legislative branches from reducing, directly or indirectly, the dollar amount of judicial salaries, and also obligates those two branches of the Government to take such action as from time to time may be necessary to prevent diminishment of judicial compensation as a result of substantial reductions in the value of money.[1]

The salary of plaintiffs remained unchanged between March 15, 1969, and October 1, 1975. Between those dates, the real value of the dollar, measured by the Consumer Price Index (CPI), decreased by 34.4 percent. As a result, the real value of the compensation for each district judge was diminished from $40,000 to about $26,200, and the real value of the salary of a circuit judge was reduced from $42,500 to about $27,800, according to plaintiffs.

Both the executive and legislative branches, plaintiffs claim, acted affirmatively to prevent federal judges from receiving salary increases designed to offset the diminution in compensation caused by inflation. Pursuant to the so-called Federal Salary Act of 1967, 2 U.S.C. §§ 351 *et seq.* (1970) (hereinafter the Salary Act or the Act), the Commission on Executive, Legislative, and Judicial Salaries (the Commission) recommended in 1973 that the salaries of federal judges be increased by about 25 percent. However, the President submitted to Congress a recommendation that judicial salaries be increased 7.5 percent in each of the fiscal years 1974, 1975, and 1976. Had Congress taken no action, the increases proposed by the President would automatically have gone into effect, but the Senate voted to prevent the increases. On August 9, 1975, the Executive Salary Cost-of-Living Adjustment Act, Pub.L. 94–82, 89 Stat. 421 (codified at 2 U.S.C. § 31 (Supp. V, 1975)), was enacted. Plaintiffs say that it incorporates and perpetuates the diminution in the real value of judicial compensation which had occurred since March 1969. As a result of these actions by the President and Congress, the salary of a district judge on October 1, 1975, was set at $42,000, but when expressed in real terms is equal to $27,510, according to plaintiffs. As of the same date, the salary of a circuit judge was set at $44,625, but when expressed in real terms is equal to $29,230 by plaintiffs' calculation.

As a consequence of the foregoing, plaintiffs allege that they have suffered an unconstitutional deprivation of earnings, because their salaries have been diminished.

Plaintiffs also allege that Congress has discriminated against judges in dealing with the problem of inflation as compared to their own Members and to other Government employees. They point out that Congress raised most Government employees' salaries 36.5 percent between December 1969 and 1975; and raised the salaries of starting Government lawyers 59.32 percent

1. Article III, section 1, of the Constitution provides:

"The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."

between March 1969 and October 1975; and raised the pay of all Armed Forces to more than twice their former level; and raised the salaries and size of its own staff and increased its own allowances, but judges' salaries were not raised at all. The plaintiffs say this discrimination violates article III, section 1, of the Constitution.

(2) *Count II:* In the Salary Act, Congress authorized the President to adjust judicial salaries every fourth year. As mentioned above, he recommended that judicial salaries be increased 7.5 percent in each of the fiscal years 1974, 1975, and 1976, and these recommendations would have become effective but for S.Res. 293, 93d Cong., 2d Sess., 120 Cong.Rec. 5508, which disapproved the President's recommendations on March 6, 1974, pursuant to 2 U.S.C. § 359(1)(B) (1970). Plaintiffs allege the action of the Senate was an unlawful and an unconstitutional exercise of executive power reserved to the President by article II, section 1, of the Constitution. Furthermore, they say that the Senate resolution did not constitute the enactment of legislation in accordance with the requirements of article I, sections 1 and 7, of the Constitution. The allegedly unconstitutional provision (section 359(1)(B)) is claimed to be severable from the remainder of the Act.[2] Therefore, plaintiffs say, the salary adjustments recommended by the President became legally effective in March of 1974, which entitled them to a 7.5-percent salary increase in March 1974, and a like increase in March 1975, and the same increase in March 1976, making a total salary increase to date of 24.23 percent. Plaintiffs seek to recover these increases in salary as back pay which

they allege is presently due them. Plaintiffs have filed a motion for summary judgment.

Defendant has filed a motion to dismiss plaintiffs' petitions, alleging: (1) plaintiffs have been fully compensated according to law because the Constitution does not grant plaintiffs an enforceable right to money equal to the impact of inflation on their compensation, (2) the claim of plaintiffs is nonjusticiable, (3) section 359(1)(B) is inseverable from the remainder of chapter 11, title 2, U.S.C. (2 U.S.C. §§ 351–361), and therefore that chapter cannot be the basis for a recovery of money damages by plaintiffs, and (4) alternatively, even if section 359(1)(B) is unconstitutional and severable, the remainder of the Act should be applied prospectively only and should not be the basis for a recovery of back pay by plaintiffs.

The Senate and House of Representatives of the United States Congress have filed amici curiae briefs, at the invitation of the court, in which they allege as to count II that the Constitution commits to Congress the exclusive power to ascertain judicial salaries by any means it deems "necessary and proper" and that section 359(1)(B) is such means; that such section is constitutional and is not outlawed by the separation-of-powers doctrine; that plaintiffs' claim in count II involves a political question and is nonjusticiable; that the "one-House veto" is valid and constitutional; and that section 359(1)(B) is inseverable from the remainder of the Act.

The case is before the court on plaintiffs' motion for summary judgment and defend-

---

2. 2 U.S.C. § 359 (1970) provides as follows:

"(1) Except as provided in paragraph (2) of this section, all or part (as the case may be) of the recommendations of the President transmitted to the Congress in the budget under section 358 of this title shall become effective at the beginning of the first day period which begins after the thirtieth day following the transmittal of such recommendations in the budget; but only to the extent that, between the date of transmittal of such recommendations in the budget and the beginning of such first pay period—

"(A) there has not been enacted into law a statute which establishes rates of pay other than those proposed by all or part of such recommendations,

"(B) neither House of the Congress has enacted legislation which specifically disapproves all or part of such recommendations, or

"(C) both.

"(2) Any part of the recommendations of the President may, in accordance with express provisions of such recommendations, be made operative on a date later than the date on which such recommendations otherwise are to take effect."

ant's motion to dismiss plaintiffs' petitions. The parties agree that there are no facts in dispute on the issue of liability.

I

*The Application of the Judicial Disqualification Act to these Suits*

A threshold question of whether or not the judges of the Court of Claims are disqualified from deciding the instant suits because of the provisions of the Judicial Disqualification Act, 28 U.S.C. § 455 (Supp. V, 1975), and the requirements of Canon 3C(1)(c) of the Code of Judicial Conduct of the American Bar Association adopted by the Judicial Conference of the United States, must be decided by the court. All parties agree that the judges of this court are article III judges and receive the same salary that the circuit judges who are plaintiffs in the instant cases receive. Consequently, the judges of this court have an *indirect* interest in the subject matter of the controversy that could be substantially affected by the outcome of these proceedings. However, the judges of this court have no *direct* financial interest in these cases, since none of the judges is a party nor owns any legal or equitable interest, however small, in the claims the plaintiffs are asserting, nor in any party to the proceedings. The plaintiffs do not maintain their suits as class actions.

The Judicial Conference of the United States adopted the Code of Judicial Conduct of the American Bar Association with modifications approved April 6, 1973, and March 6, 1975. Canon 3C(1)(c), as adopted by the Conference, provides:

(1) A judge shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

\*　　\*　　\*　　\*　　\*　　\*

(c) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that

could be substantially affected by the outcome of the proceeding[.]

By resolution of March 6, 1975, the Conference also provided that Canon 3D should be stricken from the Code as adopted by the Conference so that a judge's disqualification on account of his financial interest may not be waived by agreement of the parties.

On December 5, 1974, 88 Stat. 1609, the Judicial Disqualification Act cited above was enacted. It provides as follows:

§ 455.

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

\*　　\*　　\*　　\*　　\*　　\*

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

\*　　\*　　\*　　\*　　\*　　\*

(d)(4) "financial interest" means ownership of a legal or equitable interest, however small, \* \* \*.

\*　　\*　　\*　　\*　　\*　　\*

(e) No justice, judge, magistrate, or referee in bankruptcy shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). \* \* \*.

After the filing of the present suits, the court, mindful of the above provisions of the Code of Judicial Conduct and the Disqualification Act, and being troubled about whether the judges were disqualified to decide these cases, sought guidance from the Supreme Court of the United States by certifying the following question to that Court:

In view of the express provisions of Pub.L. 93–512 and the resolutions of the

Judicial Conference as set forth above, are the judges of the Court of Claims required to disqualify themselves in these cases, or does the "doctrine of necessity" authorize and require the judges of the Court of Claims to hear and decide these cases.

Thereafter, the Supreme Court called upon the parties to submit briefs, which was done. In the brief for the Government, the Honorable Robert H. Bork, Solicitor General of the United States, stated emphatically that the first portion of the certified question should be answered in the negative and the second portion should be answered in the affirmative. The Solicitor General stated that the United States "hereby waives" that provision of 28 U.S.C. § 455(a) which provides that a judge must step aside "in any proceeding in which his impartiality might reasonably be questioned." He stated further that the provisions in section 455(b)(4) which prohibit a judge from deciding any case in which he has "a financial interest in the subject matter in controversy" or "an interest that could be substantially affected by the outcome of the proceeding" which cannot be waived because of section 455(e), should not be interpreted to mandate recusal where, as here, the option of selecting another judge is unavailable. He pointed out that the legislative history strongly suggests that had Congress focused on the unusual problem presented by these cases, it would have explicitly have made section 455(b) waivable or inapplicable in this situation. The Solicitor General stated further:

> In sum, we believe that the judges of the Court of Claims are not required by 28 U.S.C. (Supp. IV) 455 to disqualify themselves and that the "rule of necessity" authorizes the judges of the Court of Claims to hear and decide these cases.
> * * *

The plaintiffs agreed completely with the Solicitor General in their brief filed in the Supreme Court, and took the unequivocal position that the "rule of necessity" not only authorized the judges of the Court of Claims to decide these cases, but also required them to do so.

After considering the briefs of the parties, the Supreme Court dismissed our certified question without comment or opinion. Having failed to obtain guidance from the Supreme Court, we concluded that we must determine for ourselves whether or not we are disqualified from deciding these cases because of the Code of Judicial Conduct and the Judicial Disqualification Act. This requires a consideration and discussion of the "rule of necessity" mentioned above.

██ At the outset, it must be kept in mind that these cases are suits against the United States for money damages amounting to more than $10,000. Under the law, the cases are required to be filed in this court, as no other court has jurisdiction of suits of this nature. Therefore, the cases have to be tried in this court. If the judges of this court are disqualified because of their indirect interest in the subject matter in controversy or because of any other interest that could be substantially affected by the outcome of the proceedings, all of the other judges of the United States are similarly disqualified. There is no federal judge who would be available to try the cases. Situations of this kind caused a doctrine known as the rule of necessity to be developed in the law.

██ The rule of necessity was a part of the English common law and has been traced back to 1430 and the Year Books. *Dimes v. Grand Junction Canal Co.*, 10 Eng. Rep. 301, 313 (1852). *See also, The Independence of the Judiciary*, 34 Can.B.Rev. 769, 790 (1956); and Frank, *Disqualification of Judges*, 56 Yale L.J. 605, 609–10 (1947). The rule, simply stated, means that a judge is not disqualified to try a case because of his personal interest in the matter at issue if there is no other judge available to hear and decide the case.

The rule of necessity has been applied many times by state courts.[3] The cases of

---

**3.** *See, e. g., State ex rel. Gardner v. Holm*, 241 Minn. 125, 62 N.W.2d 52 (1954); *Higer v. Han-*sen, 67 Idaho 45, 170 P.2d 411 (1946); *State ex rel. Mitchell v. Sage Stores Co.*, 157 Kan. 622,

*McCoy v. Handlin,* 35 S.D. 487, 153 N.W. 361 (1915), and *State ex rel. Gardner v. Holm,* 241 Minn. 125, 62 N.W.2d 52 (1954), involved the payment of judicial salaries. In the latter case, the Supreme Court of Minnesota held:

> * * * [W]e must frankly admit that there is such an indirect interest that were it possible to do so we should all be happy to declare ourselves disqualified. Nothing is better established than the principle that no judge or tribunal should sit in any case in which he is directly or indirectly interested. * * * However, this principle must yield to the stern necessities of a case; and when there is no other tribunal that can determine the matter, it is the duty of the court, which would ordinarily be disqualified, to hear and determine the case, however disagreeable it may be to do so. The judicial function of courts may not be abdicated even on the grounds of interest when there is no other court that can act. * * *. [62 N.W.2d at 53–54.]

The rule has been applied consistently in federal courts.[4] It has been applied in many cases notwithstanding the existence of disqualification statutes.[5]

The controlling decisions of the Supreme Court on the subject of the rule of necessity are the three decisions in *Evans v. Gore,* 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920), *Miles v. Graham,* 268 U.S. 501, 45 S.Ct. 601, 69 L.Ed. 1067 (1925), and *O'Malley v. Woodrough,* 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289 (1939). Each of those cases involved plaintiffs who were judges claiming that the Federal Government could not constitutionally require an article III judge to pay income tax. Each of those cases was decided in the presence of a statute which disqualified a judge who was "in any way concerned in interest in any suit pending * * *." 36 Stat. 1090 (1911). The *Evans* Court, discussing the question of disqualification, held:

> * * * Because of the individual relation of the members of this court to the question, * * * we cannot but regret that its solution falls to us; and this although each member has been paying the tax in respect of his salary voluntarily and in regular course. But jurisdiction of the present case *cannot* be declined or renounced. The plaintiff was entitled by law to invoke our decision on the question as respects his own compensation, in which no other judge can have any direct personal interest; and there was no other appellate tribunal to which under the law he could go. He brought the case here in due course, * * *. In this situation, the only course open to us is to consider and decide the cause,—a conclusion supported by precedents reaching back many years. * * *. [253 U.S. at 247–48, 40 S.Ct. at 551.] [Emphasis supplied.]

After surveying the field, a leading authority on administrative law wrote in 1958 that *Evans v. Gore, supra,* still states the law of this subject. 2 K. Davis, Administrative Law Treatise § 12.04 (1958).

In the case of *Brinkley v. Hassig,* 83 F.2d 351, 357 (10th Cir. 1936), the court held:

> From the very necessity of the case has grown the rule that disqualification will not be permitted to destroy the only tribunal with power in the premises. If the law provides for a substitution of personnel on a board or court, or if another tribunal exists to which resort may be

---

4. 143 P.2d 652 (1943); *Gordy v. Dennis,* 176 Md. 106, 5 A.2d 69 (1939); *McCoy v. Handlin,* 35 S.D. 487, 153 N.W. 361 (1915); *State ex rel. Null v. Polley,* 34 S.D. 565, 138 N.W. 300 (1912). An extensive collection of cases discussing the rule of necessity is compiled at 39 A.L.R. 1476.

4. *O'Malley v. Woodrough,* 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289 (1939); *Miles v. Graham,* 268 U.S. 501, 45 S.Ct. 601, 69 L.Ed. 1067 (1925); *Evans v. Gore,* 253 U.S. 245, 40 S.Ct.

550, 64 L.Ed. 887 (1920); *Brinkley v. Hassig,* 83 F.2d 351 (10th Cir. 1936); *Turner v. American Bar Ass'n,* 407 F.Supp. 451 (N.D.Tex.1975); *United States v. Corrigan,* 401 F.Supp. 795 (D.Wyo.1975).

5. *See* Act of May 8, 1792, ch. 36, § 11, 1 Stat. 278; Act of March 3, 1821, ch. 51, 3 Stat. 643; Act of March 3, 1911, ch. 231, § 20, 36 Stat. 1090; Act of June 25, 1948, ch. 646, § 455, 62 Stat. 908; 28 U.S.C. § 455 (Supp. V, 1975).

had, a disqualified member may not act. *But where no such provision is made, the law cannot be nullified or the doors to justice barred because of prejudice or disqualification of a member of a court or an administrative tribunal.* * * *. [Emphasis supplied.]

Two recent cases that have been decided since the enactment of the present disqualification statute, in which the rule of necessity was applied, are *United States v. Corrigan*, 401 F.Supp. 795 (D.Wyo.1975), and *Turner v. American Bar Ass'n*, 407 F.Supp. 451 (N.D.Tex.1975). In the *Corrigan* case, the court held:

> Another statute, 28 U.S.C. § 455, provides that a judge shall disqualify himself in any case in which he has a substantial interest or his impartiality might be questioned. Ordinarily when a judge is named as a defendant in a suit brought by a defendant before him in trial, such judge should automatically disqualify himself.

> However, necessity may obviate this rule when virtually no judge would be available to hear the suit because all federal judges are co-defendants. *See Butler and Daly v. The ABA, et al.*, No. 75–C–72 (N.D.Ill., order entered by Judge Frank McGarr on Jan. 9, 1975); *Evans v. Gore*, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920); *Brinkley v. Hassig*, 83 F.2d 351 (10th Cir. 1936). In this situation, if we were to disqualify ourself [sic] from hearing the matter on the ground urged by defendant, there would be few, if any, federal judges who could hear the trial and none in this circuit. Thus, we conclude that the necessity for the case to be heard by a federal judge militates strongly against disqualification of this judge. [401 F.Supp. at 798.]

In the *Turner* case, the court stated:

With respect to disqualification in civil actions where the trial judge to which the case happens to be assigned is also a defendant in the same action. 28 U.S.C.A. § 455 would require that the judge disqualify himself. This Court notes, however, that there is a maxim of law to the effect that where all are disqualified, none are disqualified. *Evans v. Gore*, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 * *. The theory supporting this maxim is that if disqualification operates so as to bar justice to the parties and no other tribunal is available, the disqualified judge or judges may by necessity proceed to judgment. 48 C.J.S. Judges § 74. Although this maxim would allow the Supreme Court to proceed where all or a quorum of the Justices have been sued, it would seemingly not allow a District Court Judge to proceed if other judges are available by substitution. *Brinkley v. Hassig*, 83 F.2d 351 (C.A.10, 1936). [407 F.Supp. at 483.]

All of the foregoing cases applying the rule of necessity were decided against a background of statutes providing for the disqualification of interested judges. The courts have not hesitated to apply the rule in situations where to do otherwise would result in closing the doors of the courts to litigants.

The first disqualification statute in the United States was the Act of May 8, 1792, ch. 36, § 11, 1 Stat. 278, which was amended by the Act of March 3, 1821, ch. 51, 3 Stat. 643, quoted in *Spencer v. Lapsley*, 61 U.S. (20 How.) 264, 266, 15 L.Ed. 902 (1857). The Act was further amended by the Act of March 3, 1911, ch. 231, § 20, 36 Stat. 1090. The 1911 statute was the law when *Evans v. Gore, supra, Miles v. Graham, supra,* and *O'Malley v. Woodrough, supra,* were decided.[6] It provided:

---

**6.** The entire legislative history fails to demonstrate any mention of the rule of necessity or a desire to change it, as motivating the 1911 Act. (A statement by Congressman Cullop vaguely suggests, however, that although he disapproved of the rule of necessity he recognized that it was the governing law. 46 Cong.Rec. 305–7 (Dec. 14, 1910.) *See* H.Rep. No. 818,

61st Cong., 2d Sess. (1910); H. Doc. No. 783, vol. 127, pt. 1, 61st Cong., 2d Sess. (1910); S.Rep. No. 388, 61st Cong., 2d Sess. (1910); S.Doc. No. 818, 61st Cong., 2d Sess. (1910). Debates on bill H.R. 23377—House debate; 45 Cong.Rec. 2937 (Mar. 9, 1910); *id.* at 3179 (Mar. 15, 1910); *id.* at 3585 (Mar. 23, 1910); *id.* at 3596–614 (Mar. 23, 1910); *id.* at 3998–4001

Sec. 20. Whenever it appears that the judge of any district court is in any way concerned in interest in any suit pending therein, or has been of counsel or is a material witness for either party, or is so related to or connected with either party as to render it improper, in his opinion, for him to sit on the trial, it shall be his duty, on application by either party, to cause the fact to be entered on the records of the court; and also an order that an authenticated copy thereof shall be forthwith certified to the senior circuit judge for said circuit then present in the circuit; and thereupon such proceedings shall be had as are provided in section fourteen.

The 1911 statute was amended by the Act of June 25, 1948, to read:

Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest * * *. [Ch. 646, § 455, 62 Stat. 908 (1948).]

The legislative history of the 1948 revision discloses no indication whatsoever that Congress intended to modify or to repeal the pre-existing rule of necessity.[7] Indeed, cases invoking that rule have been decided since the enactment of the 1948 statute, and, as previously mentioned, a leading

commentator noted in 1958, after surveying the relevant law, that *Evans v. Gore, supra,* is "still a realistic guide on the rule of necessity." 2 K. Davis, Administrative Law Treatise § 12.04 (1958). *See also, United States v. Corrigan, supra,* and *Turner v. American Bar Ass'n, supra.*

The statute was amended again in 1974, which is our present statute, quoted above at the outset of this discussion. The purpose of the 1974 revision was to conform statutory law with the Code of Judicial Conduct of the American Bar Association as adopted with modifications by the Judicial Conference of the United States. There is no mention in the reports of the adoption of the Code by the Judicial Conference nor in the legislative history of the 1974 revision of the rule of necessity, nor is there any indication therein of any intent or purpose to change or in any way to overturn that well-established doctrine.[8]

■■■ A cardinal principle of statutory interpretation is that, in the absence of a clearly expressed intent to the contrary, the revision or recodification of a statute indicates approval of court interpretations of the statute made prior to reenactment.[9] Also, it is not presumed that the common law is changed by the passage of a statute

(Mar. 30, 1910); 46 Cong.Rec. 83–97 (Dec. 7, 1910); *id.* at 294 (Dec. 14, 1910); *id.* at 305 (Dec. 14, 1910); *id.* at 564–76 (Dec. 21, 1910); *id.* at 789–811 (Jan. 11, 1911); *id.* at 1060–79 (Jan. 18, 1911); *id.* at 1432–60 (Jan. 25, 1911); *id.* at 1773–93 (Feb. 1, 1911); *id.* at 2143–67 (Feb. 8, 1911); *id.* at 2606–34 (Feb. 15, 1911); 46 Cong.Rec.App. 52–53.

Senate debate: 46 Cong.Rec. 731 (Jan. 10, 1911); *id.* at 839–40 (Jan. 13, 1911); *id.* at 928–54 (Jan. 16, 1911); *id.* at 1536–45 (Jan. 27, 1911); *id.* at 2131–40 (Feb. 8, 1911); *id.* at 3258 (Feb. 24, 1911); *id.* at 3760–64 (Mar. 1, 1911); *id.* at 3847 (Mar. 2, 1911); *id.* at 3853 (Mar. 2, 1911); *id.* at 3998–4012 (Mar. 2, 1911); 46 Cong.Rec.App. 213, 216.

7. *See,* on bill H.R. 2055 introduction on Feb. 19, 1947, 93 Cong.Rec. 1154. On bill H.R. 3214 (substituted for H.R. 2055); H.Rep. No. 308, 80th Cong., 1st Sess. (1947); S.Rep. No. 1559, 80th Cong., 2d Sess. (1948); Debate: 94 Cong. Rec. 7500 (June 9, 1948; Senate), 94 Cong.Rec. 7927–30 (June 12, 1948; passed Senate), 94 Cong.Rec. 8297 (June 15, 1948; Senate), 94 Cong.Rec. 8498–501 (June 16, 1948; passed House), 94 Cong.Rec. 8540 (June 17, 1948;

House), 94 Cong.Rec. 8714 (June 17, 1948; House), 94 Cong.Rec. 9367 (June 17, 1948; House).

8. *See* hearings before the Subcommittee on Improvements in Judicial Machinery, Committee on the Judiciary, on S. 1064, July 14, 1971; May 17, 1973; S.Rep. No. 93–419, 93d Cong., 1st Sess. (1973); H.Rep. No. 93–1453, 93d Cong., 1st Sess. (1974); Debate: 119 Cong.Rec. Daily Ed. (Oct. 4, 1973, Senate); 119 Cong.Rec. Daily Ed. (Nov. 21, 1974, Senate); 120 Cong. Rec. Daily Ed. (Nov. 18, 1974, House).

9. *See generally* 2A C. Sands, Sutherland Statutory Construction §§ 45.12, 46.01, 49.07, 49.09 (1973), and cases cited therein; *Francis v. Southern Pac. Co.,* 333 U.S. 445, 450, 68 S.Ct. 611, 92 L.Ed. 798 (1948); *Jones v. Liberty Glass Co.,* 332 U.S. 524, 68 S.Ct. 229, 92 L.Ed. 142 (1947); *Helvering v. Griffiths,* 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843 (1943); *Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536 (1939).

which gives no indication that it proposes such a change. 2A C. Sands, Sutherland Statutory Construction § 45.12 (1973). Since the common law rule of necessity was not mentioned in the legislative history of the 1974 statute, it is our view, along with that of the courts in *United States v. Corrigan, supra,* and *Turner v. American Bar Ass'n, supra,* that the rule is a viable maxim today, and that it is as applicable to present day litigation, in proper cases, as it was at any time during the history of our jurisprudence.

It should be pointed out that at oral argument of these cases, the Honorable Rex E. Lee, Assistant Attorney General of the United States, in answer to a question of the Chief Judge of our court, and speaking for the Government, stated unequivocally that he and the Department of Justice agreed with and adopted the statement in the brief of the Solicitor General, filed in the Supreme Court in connection with our certified question, that the judges of the Court of Claims are not required to disqualify themselves in these cases and that the doctrine of necessity authorizes and requires the judges of this court to decide the cases.

■■■ As judges of this court, we find ourselves in much the same position as the judges in *Evans v. Gore, supra.* We regret that it falls our lot to decide these cases, and we would much prefer that a resolution of the controversy not be our responsibility. Nevertheless we realize that the plaintiffs are entitled to have their cases heard and decided by a court of the United States, and under the law there is no other court to which they could go. Should we refuse to hear and decide their cases, the doors of the courts would be closed to them. This could amount to a denial of due process under the 14th amendment to the Constitution. *See Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). It is a fundamental principle of our jurisprudence that access to the courts to secure and establish important rights should be made available to all citizens at all times. This is particularly true where the complaining parties are asserting claims under the Constitution, as in the instant cases.

■■■ We hold that under the rule of necessity we are qualified, authorized, and required to decide the instant cases, and on that basis we will proceed to do so in the following portions of this opinion.

## II

*Count I—Inflation and Salary Diminution*

Moving to the merits of the case, plaintiffs argue that the failure of Congress to raise their salaries by more than 5 percent since 1969, coupled with severe economic inflation in the interim, is in violation of the constitutional provision which states that federal judges "shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S.Const. art. III, § 1. Plaintiffs ask the court to vitiate Congress's alleged disobedience of the Constitution by awarding them back pay in order to equalize the "real dollar value" of their salary payments since 1969, as measured by the CPI, with the level of compensation that Congress set for them in that year. Defendant replies that this court lacks jurisdiction to decide this case, that even if the court has power to rule on plaintiffs' claim the Constitution affords them none of the protection against inflation that they assert it does, and that in any event the present controversy is nonjusticiable. We will first review the economic circumstances that led plaintiffs to bring this action, and then discuss and determine the validity of plaintiffs' claim and defendant's objections.

In 1967, Congress enacted the Salary Act, which provided for a special Commission to meet quadrennially to recommend adjustments in congressional, judicial, and certain top level executive salaries. The Commission is composed of nine members, appointed from private life; three are appointed by the President, one of whom is designated the chairman; two are appointed by the President of the Senate; two by the Speaker of the House; and two by the Chief

Justice. 2 U.S.C. § 352(1). Under the Act, Commission recommendations are considered by the President, who then transmits to Congress in his annual message in the year after the Commission meets the salary adjustments, if any, that he deems appropriate. These pay levels take effect automatically after the budget message has been before Congress for 30 days, unless either House of Congress passes a simple resolution opposing the salary changes, or unless a statute has been enacted in the meantime setting new pay scales. Pursuant to this plan, a Commission convened in 1968, the President passed along his recommendations to Congress in January 1969, and the congressional, judicial, and top executive salaries thus recommended took effect in March 1969. As previously noted, in 1973 a new Commission met, but this time the Commission's suggestions embarked on a rocky and ultimately fatal course. The 1973 Commission, noting the high rate of economic inflation during the preceding 4 years, proposed increases of roughly 25 percent in the salaries over which it had cognizance. President Nixon modified this, submitting to Congress in January 1974 pay raises of about 7.5 percent per year for 1974, 1975, and 1976. The Senate, however, balked at even this much of an increase, and voted on March 6, 1974, to adopt S.Res. 293, preventing the salary adjustments from taking effect. Congress did approve, effective October 1975, a 5-percent upward adjustment in the compensation of judges, top administrators, and its own Members— the only change in their compensation from March 1969 through the end of 1976.

Unfortunately, in the same period, the economic inflation experienced by the nation was not as susceptible to blockage by congressional veto. According to an economist's affidavit submitted on plaintiffs' behalf, the CPI rose by more than 52 percent between March 1969 and October 1975, meaning a 34.4-percent decrease in the real value of the dollar over the same period. The affidavit further recites that from mid-1969 to mid-1974, while the CPI rose nearly 35 percent, the average weekly pay of American wage earners and the earnings of American lawyers increased at approximately that same rate, and salaries of top business executives increased by 60 percent on the average. When wage and price figures for 1976 are added to this picture, the inflationary distortion of the dollar becomes even more dramatic. The recently filed report of the Commission (Dec. 1976) notes:

During the time in question—1969 to 1976—in which * * * [top federal executives, judges, and congressmen] received a total 5% increase, average hourly private nonfarm earnings increased by 70.1%. The Consumer Price Index for urban wage earners and clerical employees went up nearly as rapidly, by 60.5%. General Schedule Federal Civil Service pay increased on the average during that period by 65.7%, and in the so-called "super grades" GS 16–18, by 48.9%.

The 1976 survey of executive pay ($30,000 to $65,000) in 318 private companies showed a salary increase during those seven years of 52.5% in all companies and of 58.6% in companies where no bonuses were paid.

The Administrative Office of the United States Courts informed the Commission in November 1976 that, taking into account the 1975 5-percent increase in salary, the average after-tax purchasing power of federal judges and justices declined by 36 percent from March 1969 through the first months of 1977. The Administrative Office noted, by contrast, that in the same period the salaries of auditors rose 50.7 percent, job analysts 52.3 percent, engineering technicians 55.6 percent, personnel directors 58.9 percent, and chief accountants 59.4 percent.

It appears from plaintiffs' submissions of record and from the foregoing reports of which we take notice, Fed.R.Evid. 201, that plaintiffs, their brethren on the federal bench, Members of Congress, federal employees on the Executive Schedule, and those Americans living on fixed incomes not affected by increased Social Security, pension, and welfare benefits, comprise the class of citizens who have borne the brunt of inflation. Their compensations have not kept up substantially with the rising, at

times skyrocketing, cost of living, reflected by inflation which in 1974 alone rose to 12.2 percent. For the federal judge, according to the Administrative Office, this almost singular decline in purchasing power has occurred in the face of a steeply rising workload, with the average district judge disposing of 32 percent more cases in 1976 than in 1968, and the average court of appeals judge nearly double the number of cases in 1976 than 8 years before. Moreover, unlike the case with Members of Congress and certain persons on relatively low official salaries, the Administrative Office told the Commission "the capacity to earn income in augmentation of judicial salaries is virtually nonexistent."

* * * First of all, their [the judges'] work is burdensome and time consuming and simply does not afford time for outside endeavors. Secondly, the nature of the outside work in which they may engage is severely restricted.

* * * A judge may not serve as an officer, director, manager, advisor or employee of any business organized for profit. He is required to manage his investments and financial interests to minimize the number of cases in which he may be disqualified because of a financial interest. * * * He may not serve as an executor, administrator, trustee, guardian, or other fiduciary except with respect to members of his family. He may not practice law nor serve as an arbitrator or mediator.

The result of this constriction on the incomes of federal judges, not experienced by many others in the society generally, has been a growing number of resignations and of declinations to serve on the bench for financial reasons. The Administrative Office reported what it considered an unprecedented number of resignations from the bench, eight of them from November 1973 to May 1976, to reenter private practice or engage in some other occupation, all at substantial increases in compensation. Plaintiffs have submitted some affidavits from sitting and resigned judges and one Member of Congress attesting to the gravity of the problem created by the 7-year pay freeze on judicial compensation. The Member, Charles H. Percy, senior United States Senator from Illinois, submitting his affidavit "having lost hope for legislative redress to the serious problem of low judicial salaries," stated that the—

increasing difficulty of inducing successful attorneys in private practice to accept federal judgeships at the current salary level has become a definite problem in * * * [recommending judicial candidates to the President]. During the past seven years twelve individuals who were my first choice as candidates for federal District Court and Court of Appeals judgeships decided that while they were extremely desirous of serving on the federal bench, they could not accept such a position at the current salary level. In each case, the candidate felt compelled to refuse since the dramatic reduction in income would have resulted in jeopardizing the education of his children.

The affidavits of seven former federal judges, one of them the Honorable Griffin B. Bell, now Attorney General of the United States, show that in the case of each of them the lack of salary adjustment in the face of spiraling inflation contributed to resignation from the bench. Some expressed the view that Congress had abandoned the judiciary or was using judicial salaries as a political football. The affidavit of one sitting judge points out that he can continue serving as a federal judge only because his wife is employed. We note, also, that three trial judges of the United States Court of Claims have left the court, one by retirement and two for much higher salaries in private practice, all because of the prolonged salary freeze.

Defendant does not deny the basic facts of the federal judicial salary problem as just outlined. It admits the existence of inflation but declines to accept the CPI as the measure of inflation relevant to judges, stating that that index is compiled with regard to urban wage earners and clerical workers, and that a trial would be needed to establish a price measure reflecting the experience of federal judges as a group,

should resolution of this litigation ultimately require a determination of the impact of inflation on the purchasing power of plaintiffs. However, defendant believes that such a determination is unnecessary, and proceeds with legal arguments that it considers dispositive of the inflation issue in this case. Accordingly, we now address those arguments, viewing the facts as pleaded and disclosed in the affidavits in a light most favorable to plaintiffs. In view of our disposition of this issue, we also accept *arguendo* the applicability of the CPI to plaintiffs for the purpose of measuring the effect of inflation on the real dollar value of their official compensation.

### A.

Plaintiffs assert that the Compensation Clause of article III, section 1 (hereinafter Compensation Clause or Clause), not only protects them from substantial diminution of the purchasing power of their salaries, but is "self-executing" in doing so, *i. e.,* the Clause itself creates a claim against the Treasury whether Congress has acted or not. *Cf. United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (just compensation clause of fifth amendment provides remedy for taking); *Bivens v. Six Unknown Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (search and seizure clause of fourth amendment authorizes suit for damages). Defendant counters that this court lacks jurisdiction of a claim brought under the Clause precisely because it is not self-executing, and in any event because it cannot be the basis for a claim for money beyond that authorized by statute at some point during a sitting judge's tenure. If defendant is correct, of course, discussion on count I of plaintiffs' petitions must come to an end, since this court has jurisdiction of count I only if the Clause "can, in itself, fairly be interpreted as prescribing a payment by the United States in the circumstances present." *Gentry v. United States,* Ct.Cl., 546 F.2d 343, 345 (1976). *See United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Eastport S. S. Corp. v. United States,* 372 F.2d 1002, 178 Ct.Cl. 599 (1967).

The parties agree that no statute or regulation authorizes the payment plaintiffs seek here, unless S.Res. 293 was invalid for reasons considered in the discussion of count II of the petitions, *infra.*

Interpretation of the Compensation Clause has concerned the Supreme Court on several occasions in the past. *Evans v. Gore, supra,* held that the Clause precluded Congress from levying an income tax pursuant to the 16th amendment on the official salaries of federal judges already in office. *Miles v. Graham, supra,* decided that the same was true—that an income tax diminished a judge's compensation in violation of the Clause—for a judge appointed after the enactment of the revenue statute as well as for one already serving when the statute was approved. In the course of issuing these rulings, no longer good law as will be seen shortly, the Court reviewed the background and articulated the nature of the Compensation Clause, enunciating principles that continue to be valid and that will guide us in ascertaining the meaning of the Clause as it relates to our jurisdiction over the present controversy. In *Evans,* Justice Van Devanter began his majority opinion by noting that the constitutional separation of powers, as a means of securing "a larger measure of liberty and justice," depended for its efficacy upon making the three branches of the Government "relatively independent" of one another. His opinion says that the Framers were greatly concerned with protecting against invasion of judicial independence by the President and Congress, the judiciary being thought to be by nature the weakest of the three great departments, having neither the power of the purse nor the community sword, "neither force nor will, but merely judgment." 253 U.S. at 249, 40 S.Ct. at 551, quoting from The Federalist No. 78, at 332 (C. Beard ed. 1959) (A. Hamilton). The 1787 Convention decided, the opinion continues, to build around the judiciary the twin protections of tenure in office and undiminishable compensation, in order to safeguard the courts against the actual or threatened encroachments of the political branches.

"[I]s it not plain that * * * [the] purpose [of the Tenure and Compensation Clauses] was to invest the judges with an independence in keeping with the delicacy and importance of their task and with the imperative need for its impartial and fearless performance?" 253 U.S. at 252, 40 S.Ct. at 552. The danger which the Framers foresaw, and the focus of the protections they gave to the judiciary, was legislative or executive assault on judicial independence. Justices Holmes and Brandeis, dissenting in *Evans,* did not disagree with this formulation but objected to the result because to "require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge." 253 U.S. at 265, 40 S.Ct. at 557.

What is the character of the salary diminution that can be used to attack the independence of judges? Is it only an amendment of the salary statutes, reducing the number of nominal dollars that a judge is paid from the Treasury? The *Evans* Court responded that "diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive * * *." The Court said it would ignore none of them, but would regard as prohibited by the Compensation Clause all manner of intrusions upon salary "which by their necessary operation and effect * * * take from the judge a part of that which has been promised by law for his services * * *." 253 U.S. at 254, 40 S.Ct. at 553. But exactly what is it that "has been promised by law for his services"? The majority in *Miles,* echoing many of the Court's thoughts in *Evans,* defined the constitutional term "compensation" in these words:

> The words and history of the clause indicate that the purpose was to impose upon Congress the duty definitely to declare what sum shall be received by each judge out of the public funds and the times for payment. When this duty has been complied with the amount specified becomes the compensation which is protected against diminution during his continuance in office. [268 U.S. at 508–09, 45 S.Ct. at 602.]

This description takes a rather narrow view of the constitutional protection, declaring the Compensation Clause to guarantee to judges only the number of nominal dollars fixed by Congress. It must be remembered, however, that this definition was crafted for a case in which, like *Evans,* the question was not whether the Clause safeguarded real as opposed to nominal dollar amounts, but whether an alleged diminution effected in a manner other than outright reduction of authorized salary, *cf. O'Donoghue v. United States,* 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), nonetheless violated the Clause. Important to our disposition of defendant's jurisdictional challenge is that the Court held in *Evans* and again in *Miles* that an indirect, or even evasive, diminution of judicial salary was forbidden by the words of article III. The definition of compensation in *Miles,* focusing on a "sum" fixed as compensation by statute, was framed to illustrate the point that *indirect* lowering of the compensation "taken home"—a number of dollars given a judge as salary by statute, and then some of them taken back into the same Treasury by virtue of a tax—was a constitutionally prohibited activity.

In *O'Malley v. Woodrough, supra,* the Court overruled *Miles,* and by force of reasoning overruled a good deal of *Evans,* holding that a tax levied nondiscriminatorily upon the incomes of judges and other citizens alike in no way abridged the Compensation Clause, at least as regards judges who took office after it was levied. After noting that *Evans* had "met wide and steadily growing disfavor from legal scholarship and professional opinion" and had not been followed in most decisions of courts of the states and of other nations interpreting a requirement similar to the Clause, Justice Frankfurter stated for the Court:

> * * * To suggest that * * * [a nondiscriminatory tax laid generally on income] makes inroads upon the independence of judges who took office after Congress had thus charged them with the common duties of citizenship, by making

them bear their aliquot share of the cost of maintaining the Government, is to trivialize the great historic experience on which the framers based the safeguards of Article III, § 1. [Fn. omitted.] * *.

* * * [T]o the extent that what the Court now says is inconsistent with what was said in *Miles v. Graham,* * * the latter cannot survive. [307 U.S. at 282–83, 59 S.Ct. at p. 840.]

*O'Malley,* then, had no disagreement with *Evans* and *Miles* insofar as they determined that indirect incursions upon judicial salaries, as much as direct ones, were not tolerable under the Compensation Clause. Justice Frankfurter certainly did not take issue with the emphasis of the earlier cases on the furthering of judicial independence as the Clause's chief aim. In this he was in harmony not only with the dissenting Justices Holmes and Brandeis, but also with Justice Van Devanter. A tax or other alleged diminution does not contravene the Clause when it "makes [no] inroads upon the independence of judges * * *." 307 U.S. at 282, 59 S.Ct. at 840. What *O'Malley* did add to the body of learning on the Clause was that nondiscriminatory actions of Congress, those affecting the public generally, though indirectly bringing about the lowering of judges' "take-home pay," would nevertheless pass muster under the Clause. The key to the decisions in *Evans* and *Miles,* and to the overruling of those cases in *O'Malley,* was the Court's view of the scope of protection needed to maintain an independent judiciary. This will guide our decision as well.

█ Indirect, nondiscriminatory diminishments of judicial compensation, those which do not amount to an assault upon the independence of the third branch or any of its members, fall outside the protection of the Compensation Clause, and the allegation of facts showing their existence does not state a claim for which relief can be granted in this court. Plaintiffs, however, contend not only that their salaries have, by inflation and by congressional neglect of their plight and by congressional action on behalf of others, been diminished in a dis-

criminatory fashion and to an extent that compromises the autonomy of their department, but also that the "compensation" which the Clause promises them will not be lowered is a compensation in real dollars, not nominal ones. They assert that inflation and congressional unwillingness to adjust their salaries to mitigate the effects of it have caused a decline in that supposedly guaranteed real income level, thus giving them a right to recover in this action. In other words, plaintiffs would narrow the general rule stated at the outset of this paragraph, derived from the rulings of the Supreme Court, to add a ground for relief never before accepted by any tribunal, and to do so primarily on the strength of various statements made at the Constitutional Convention.

Plaintiffs focus in their argument on the debates and votes that occurred in the Convention on July 18 and August 27, 1787. On June 13, 1787, the Convention's Committee of the Whole reported a series of resolutions that were discussed and amended throughout the following 6 weeks. Resolution 11, the first of three organizing and empowering the federal judiciary, provided *inter alia* that the national judges would "receive punctually, at stated times, a fixed compensation for their services, in which no encrease or diminution shall be made" during their terms in office. C. Rossiter, 1787: The Grand Convention 314 (1968) (hereinafter *Rossiter*). The judges' compensation appears not to have been much debated prior to issuance of this report, for the Committee of the Whole adopted it verbatim from Resolve No. 9 of Edmund Randolph's "Virginia Plan" submitted to the Convention on May 29. *Rossiter* 311. On July 18, as the Convention considered Resolution 11, New York delegate Gouverneur Morris moved to strike out the words "or encrease" on the grounds (as James Madison recorded his thought) that "the Legislature [Congress] ought to be at liberty to increase salaries as circumstances might require, and that this would not create any improper dependence in the Judges." Benjamin Franklin agreed with Morris' propos-

al noting that "[m]oney may not only become plentier, but the business of the [judicial] department may increase as the Country becomes more populous." 2 M. Farrand, Records of the Federal Convention of 1787 44–45 (1966) (hereinafter 2 *Farrand*).

Delgate Madison, however, disagreed with the motion to strike, defending the prohibition on salary increase because, while "dependence will be less if the *increase alone* should be permitted, * * * it will be improper even so far to permit a dependence. Whenever an increase is wished by the Judges, or may be in agitation in the legislature, an undue complaisance in the former may be felt towards the latter." 2 *Farrand* 45 (emphasis in text). But if a bar on salary increase is necessary to protect judicial independence, what adjustments would lie for variations in money value, living style, and workload? Here we come to the key phrase in plaintiffs' case against purely inflationary diminution of salary. Madison told the Convention: "The variations in the value of money, may be guarded agst. by taking for a standard wheat or some other thing of permanent value." [10] *Id*. Plaintiffs understand this statement of Madison's to be an explication of the term "compensation" as it existed in Resolution 11 and as it appears in article III today. They say that Madison fought for inclusion of the words "encrease or," despite the objections of Morris and Franklin, exactly because empowering Congress to raise judicial pay was unnecessary—for the compensation guaranteed the judges was the *real value* of their salaries. Plaintiffs concluded that just as Madison though using wheat as the measure of compensation would guard against real salary diminution, by adjusting automatically for changes in the nominal dollar cost of living, so must we read the Compensation Clause as instructing payment to plaintiffs of as many 1977 dollars as would equal in real value their 1969-dollar salaries.

Plaintiffs' reliance on Madison's statement overlooks several crucial facts. First of all, in response to Madison, Gouverneur Morris again addressed the Convention, commenting:

> The value of money may not only alter but the State of Society may alter. In this event the same quantity of wheat, the same value would not be the same compensation. The Amount of salaries must always be regulated by the manners & the style of living in a Country. [2 *Farrand* 45.]

Morris thus called Madison's idea unworkable. While he seemingly acknowledged that it had some appeal in dealing with inflation, he countered that the standard of living, not just the cost of living, may rise for the nation generally. Insofar as Madison's "wheat" standard might address the one problem but would definitely not adjust for the other, Morris opposed pursuing the standard further as a means of salvaging the "encrease or" language. The second point plaintiffs miss is that the Convention agreed with Morris, not with Madison: it voted, six states agreeing, two states opposing, one absent, to strike the words banning increase of salaries for sitting judges. Thirdly, it is well-nigh inconceivable that Madison and the delegates would have left in so amorphous a formulation the nature of the real value standard by which judges' compensation was to be measured, had they wholly embraced this concept and intended to make it a part of their plan of government.

If the Convention wished to ground the compensation it guaranteed the federal judiciary in an irreducible real measure, and not leave increases in salaries to the prudence of Congress, it had the opportunity to make this plain on August 27, 1787. Several weeks earlier, on August 6, the Committee of Detail reported a draft constitution to the Convention, article XI, section 2 of which provided that judges "shall, at stated times, receive for their services a compensation, which shall not be diminished during

---

**10.** He continued: "The increase of business will be provided for by an increase of the number who are to do it." 2 *Farrand* 45. This prophecy has generally been borne out though unevenly, especially in recent years.

their continuance in office." *Rossiter* 327. On August 27 delegates Madison and McHenry again moved to add language barring increases in judicial salaries. George Mason argued for the motion, contending that "[t]here was no weight . . . in the argument drawn from changes in the value of the metals, because this might be provided for by an increase of salaries so made as not to affect persons in office." Morris rose to urge defeat of the motion for the reasons he gave on July 18, and Charles Cotesworth Pinckney opposed the motion with these remarks, as Madison recorded:

> The importance of the Judiciary will require men of the first talents: large salaries will therefore be necessary, larger than the U.S. can allow in the first instance. He was not satisfied with the expedient mentioned by Col. Mason. He did not think it would have a good effect or a good appearance, for new Judges to come in with higher salaries than the old ones.

The Convention, one state in favor, five opposed, one divided, and four absent, voted down the Madison-McHenry amendment. 2 *Farrand* 429–30. Mason's comment suggests that, rather than understanding the problem of inflation to have been resolved by a *sub silentio* equation of compensation with a real value standard, he recognized that the "value of the metals" would change and that the remedy for this was an increase in salary voted by Congress, not a constitutionally based, automatic nominal pay increase. He apparently thought it less of an evil to leave the sitting judges at a lower salary than to open all judges to "an undue complaisance" towards the legislature, to use Madison's words. Mason, the great champion of individual rights which the independent courts would be relied upon to protect, was answered by General Pinckney. The latter expressly contemplated that less than adequate salaries would at first be paid by the Government, later to be adjusted as Congress deemed appropriate and necessary to attract the quality of judicial officeholder that it sought. This exchange, and the Convention's vote, is hardly a ringing endorsement of plaintiffs' "real compensation" theory.

Read in a light most favorable to plaintiffs, the words and actions of the Framers are at best inconclusive as to the meaning of "compensation" in the drafts which became article III. Plaintiffs contend that Madison's ideas were defeated, "not because his opponents felt defeat was necessary to meet the inflation problem, but because they raised two other problems that Madison did not deal with adequately[:] * * * that of giving judges higher salaries as the country grew richer and that of giving them higher salaries as they grew busier." Precisely what caused their defeat is of course speculative, for those delegates who spoke addressed a variety of issues but did not necessarily state all their reasons for support or opposition, while on the other hand very few of the delegates spoke on the subject. Still, plaintiffs are on weak ground indeed in contending that the Convention approved Madison's argument for a "wheat" standard when its official action was disapproval of his no-increase language, that the Convention sanctioned that which it did not clearly reject, that the meaning of a constitutional phrase must derive from the remarks of one Framer (albeit a very significant one) who raised the notion exactly once and never further elaborated on it.

■ Aside from what transpired at the Convention, plaintiffs' view that the guarantee of nondiminishable compensation is a promise that real salary value will always be maintained runs contrary to the Court's reasoning in *O'Malley v. Woodrough, supra.* *O'Malley* rejected the contention that a diminution of purchasing power by virtue of income taxation violated the Compensation Clause, stating that a economic burden placed nondiscriminatorily upon the public generally afforded judges no cause to complain under the Constitution. Inflation generally experienced by the public is just such a nondiscriminatory burden. If plaintiffs are correct that nothing, not even general inflation, is tolerable under article III if it lowers a federal judge's real purchasing power, then *O'Malley* is not good law. Of course, plaintiffs do not so contend.

It must be concluded, then, that the Constitution, in granting Congress the power and duty to fix judicial compensation and in not forbidding it to raise that compensation from time to time, left to the sound discretion of the political branches the adjustment of the judges' salaries as economic and other circumstances—inflation, higher living standards, need for better judges, more difficult cases, and greater caseload—required. Defendant, as noted earlier, admits of no exceptions to this grant of discretion, taking the position that plaintiffs cannot state a claim over which this court has jurisdiction insofar as they seek a salary, the nominal dollar amount of which exceeds the statutory authorization. Congress has absolute power, according to defendant, to keep the nominal dollar amount of the judicial salary where it is. We think defendant's contention goes too far. As has been said repeatedly above, the purpose of the Compensation Clause is to preclude a financially based attack on judicial independence. Justice Frankfurter, in his footnote 9 in *O'Malley,* 307 U.S. at 282, 59 S.Ct. 838, adverted to what his opinion called the "great historic experience" out of which arose article III's protections of judicial independence, namely, the Crown's attempt to subject the common law courts to its will in 17th century England. Perhaps most notable from that experience, though by no means the only such events, were the dismissals of Chief Justices Coke and Crew by the first two Stuart kings, respectively, when the former tried to limit the royal prerogative in their decisions and assert the autonomy of the courts and the supremacy of the common law. J. R. Tanner, English Constitutional Conflicts of the Seventeenth Century 1603–1689 40, 60 (1971). The reaction to these manipulations of the bench was embodied, after the Glorious Revolution, in the provisions of the Settlement Act of 1700, securing the judges' independence by limiting the Crown's ability to alter their compensation or to dismiss them. Blackstone said of this and a subsequent reform, 1 Blackstone, Commentaries *267–68:

> * * * [I]n order to maintain both the dignity and independence of the judges in the superior courts, it is enacted by the statute [the Settlement Act, 12 &] 13 W.III.c.2 [§ III], that their commissions shall be made (not, as formerly *durante bene placito,* but) *quamdiu bene se gesserint* [as long as they conduct themselves properly], and their salaries ascertained and established; but that it may be lawful to remove them on the address of both houses of parliament. And now, by the noble improvements of that law, in the statute of 1 Geo.III.[c.]23 [1760], * * * the judges are continued in their offices during their good behaviour, * * * and their full salaries are absolutely secured to them during the continuance of their commissions; * * *.

*See* D. Keir, Constitutional History of Modern Britain Since 1485 268–69 (9th ed. 1969).

The one point which is abundantly clear in the Madison-Morris exchange of July 18, 1787, is that both wished to fashion a prohibition against congressional tampering with judges' salaries as a means of thwarting the autonomy of the third branch. Only 11 years earlier the Continental Congress had complained in the Declaration of Independence that King George III had "made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries," as part of his attempt to extend a tyrannical rule over the colonies. Could not an "indirect, or even evasive" design by Congress to place judges at a severe financial disadvantage as against the remainder of the society, for the purpose of punishing judges as a class or of forcing a number of them to resign, constitute the very assault on independence which the Framers feared from historic experience? Could not Congress, for example, fix a minimum income tax on all federal employees, officials, and judges, at a practically confiscatory level at current salaries, and then dramatically raise the salaries of all but judges in order to vitiate the effect of the tax on the others? The remedy, if judicial independence were to survive, would as likely be the court-ordered increase of judges' salary levels as the rescission of the tax and the other salary boosts.

Keeping in mind that "it is a constitution we are expounding," "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs," *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 407, 415, 4 L.Ed. 579 (1819), and that the Clause itself is to be liberally applied because not a private grant of privilege but a limitation intended to benefit the public at large, *Evans v. Gore, supra,* 253 U.S. at 253–54, 40 S.Ct. 550, we hesitate to authorize the ready circumvention of the Clause's prohibition by adopting defendant's position in full. If discriminatory treatment is aimed at the judiciary by the political branches, to effect what is obviously an attack on the tenure or decisional freedom of the judges, it should not be assumed that article III does not mandate the fashioning of whatever relief is necessary to alleviate the situation. Consistent with the purpose of the Compensation Clause, as understood by the Framers and later by the Supreme Court, Congress should not be acknowledged to hold a financial "instrument [with which] to attack [one's] independence as a judge." *Evans v. Gore, supra,* 253 U.S. at 265, 40 S.Ct. at 557 (Holmes, J., dissenting). In section C of this part we will examine plaintiffs' allegations and evidence to determine if they show an injury for which we may grant damages under a theory of discriminatory assault.

Defendant further objects to plaintiffs' salary "increase" claim on the ground that, setting aside what one may think of the substantive protection afforded by the Clause, the constitutional provision on which plaintiffs rely is "not self-executing." By this is meant, defendant explains, that the Clause itself requires Congress to act in the first instance to set the judges' nominal dollar salaries, before the Clause's protection comes into play. If Congress does not alter the nominal dollar figures, reasons defendant, no help can be forthcoming from the Clause for plaintiffs' benefit beyond that which they enjoy under the existing salary levels. We need not discuss this objection as it relates to plaintiffs' "pure inflation" theory of recovery, which we

have already decided fails to state a claim upon which relief may be granted. Insofar as the objection is leveled at a "discriminatory attack" theory, it is little more than a rehash of arguments just disposed of. To say that Congress must act first to fix nominal dollar salaries assumes that such nominal amounts, when set, become the "compensation" which the Clause harbors from decrease. Yet, the whole dispute between the parties over the discrimination claim revolves about attaching to the constitutional concept of compensation the idea that it is "nominal" value only. Likewise, defendant assumes the result for which it contends when it considers the diminution against which salaries are protected to be the lowering of nominal dollar amounts only. In stating that we will not dismiss out of hand a claim that the Clause shelters the judiciary from discriminatory attack based on salary, we have, for reasons given when so stating, implicitly rejected the view that real economic value plays no part in measuring what the Clause protects.

Defendant has cited to us no cases which pronounce the Compensation Clause "not self-executing." To support its theory, defendant necessarily places much emphasis upon the Clause's words themselves. But a mere exegesis of words is not to be preferred to an interpretation of the Clause in light of its widely acknowledged purpose. Absolute deference to Congress in the prescription of the number of nominal dollars judges are to receive would eviscerate the Clause as a safeguard against a discriminatory attack on judicial independence. The Clause's terms do *not* compel endorsement of defendant's restrictive view that the provision is not self-executing, and indeed its broad and benign purpose, fundamental to the constitutional system of checks and balances, leads to the contrary conclusion. Defendant's objection cannot stand to bar judicial relief pursuant to the Clause where a proper claim for relief is established.

Though we reject defendant's contention, we admit that its focus on the Clause's language for setting salary levels in the first instance has this much merit: it

counsels rejection of plaintiffs' claim that the court as a matter of law must allow them (and judges as a class) greater compensation in order to attract individuals of high professional caliber to the federal bench. It is true that Chancellor Kent considered one of the Clause's purposes to be the assurance of quality personnel in the judicial service. 1 Kent, Commentaries *294, quoted in *Evans v. Gore, supra,* 253 U.S. at 253, 40 S.Ct. 550. Equally true is the fact that General Pinckney admonished the Convention on August 27, 1787, as noted above, that high salaries would be required to attract the judicial office persons of the professional stature that all would desire to see in that office. Whether the argument embodied in these statements is correct or not, we cannot overlook Pinckney's concurrent comment that, however high the judges' salaries should be fixed as an ideal, the Government might not at its inception be able to pay such salaries. Certainly, if less than adequate salaries could be set by Congress in the first place, the real value of which alone is protected from diminishment by the Clause, it is difficult to understand how one can find in the Clause a promise of compensation adequate to lead those high in professional standing to quit the practice of law in favor of judicial posts. In addition, deciding upon the level of salary "adequate" to attract "quality" personnel is somewhat problematic—it is first necessary to define "quality" and to determine what degree of it is to be sought after. The Constitution obviously gives no answer to this problem, nor does it instruct how much an otherwise adequate salary may properly be discounted to allow for the honor and public service "sacrifice" that historically have accompanied judicial office. We take notice of the fact, however, that the so-called "psychic income" some attribute to the prestige of a federal judgeship is not legal tender for the payment of bills judges incur just the same as do other citizens. Yet, these are matters for Congress to resolve, and no claim for relief here may be founded only on plaintiffs' equation of salary adequacy and personnel quality.

Plaintiffs offer two other arguments in support of their theory that the Clause entitles them to a nominal dollar compensation increase, short of a claim of discriminatory attack. They say, first, that the Convention used the term "compensation" in order to convey the idea of a payment in real value, as distinguished from the terms "salary" and "emoluments," which connote payments in nominal amounts. Plaintiffs instruct us that the Oxford English Dictionary, unabridged edition, defines compensation as "that which is given in recompense, an equivalent rendered," and finds the origin of the word in the concept "to counterbalance." "Salary," on the other hand, had its origin "in money given to Roman soldiers to buy salt," and means a "fixed payment made periodically to a person as compensation for regular work." "Emoluments," according to plaintiffs, means about the same as "salary." That these definitions were scrupulously followed by the Framers in crafting their product is nowhere demonstrated in the Convention's records. Plaintiffs suggest that the Compensation Clause, in the early stages of its evolution, employed the term "salaries," which the Convention later changed to "compensation." That is incorrect, however, for all drafts of the Clause, from the Virginia Plan in late May through the revisions of the Committee of Style presented to and adopted by the Convention in early September as its final document, use only the word "compensation." If plaintiffs are referring to Madison's paraphrase of the draft provision, 2 *Farrand* 44, which spoke of "salaries," this only runs counter to their argument that the differing terms had exact and mutually exclusive meanings. Madison, for one, apparently attached no special meaning to one word over the other. He recorded Gouverneur Morris as using the terms interchangeably. 2 *Farrand* 44–45. Dictionary definitions obviously should not alone control constitutional interpretation. Nothing in plaintiffs' purported distinction between compensation, on the one hand, and salary and emoluments, on the other, convinces us to depart in the slightest degree from the conclusions regarding the

nature of the Clause's protections that we have reached from other considerations previously discussed.

■ Plaintiffs' other, and final, contention is that a failure to link judicial compensation with some inflation index, thus allowing the possibility of real value decline, subjects judges to a "feeling of dependence upon the legislature for the maintenance of their compensation." The answer is that, while this may be true, no violation of the Constitution results. The Compensation Clause, though established in large part to guarantee the independence of the judicial department, permits and even contemplates a "feeling of dependence upon the legislature" to an extent. The Clause itself allows Congress to vary the nominal dollar value of judges' salaries by way of increase. As noted before, Madison objected on the Convention floor that even this led to a form of dependence, too substantial to be condoned, and warned the delegates that an undue deference to the legislature would likely result when a pay increase bill was pending in that branch. Morris acknowledged that permitting salary increases meant some degree of "dependence," but weighed the matter and concluded that an undue or "improper" dependence would not be created. The Convention voted with Morris, and against Madison, thus accepting the permissibility of less than a total judicial financial independence. In *O'Malley v. Woodrough, supra,* the Court sanctioned the taxation of judges' income, according Congress the power to vary the real compensation of judges, so long as this is done in a nondiscriminatory manner. A "feeling of dependence upon the legislature" exists among judges with respect to the level of income taxation at least as much as with respect to the level of inflation—Congress directly sets the former, and only reacts to the latter—and yet *O'Malley* finds no constitutional fault with the situation. As inferable from the Convention debates and action, and as determined by analogy from *O'Malley,* the possibility that real value decline in compensation through inflation will create a "feeling of dependence" is not enough to warrant relief under the Compensation Clause, absent proof of a claim of discriminatory attack.

■ In sum, this court has no power to grant relief on plaintiffs' complaint that inflation without substantial pay increases has diminished the real value of their official salaries, for the Constitution affords no protection from such an indirect, nondiscriminatory lowering of judicial compensation, not involving an assault upon the independence of judges. In section C of this part, *infra,* we will consider whether plaintiffs have made out a case showing the discriminatory diminishment of their salaries, in a manner that amounts to an attack on the judiciary by the political branches, warranting protection under the Compensation Clause and relief in this proceeding.

### B.

■ Defendant argues that we should deal no further with this issue, because plaintiffs' claim under count I presents a political question and is therefore not justiciable. Defendant bases this contention on *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), which dealt with an action to compel the reapportionment of a state legislature, on the ground that the existing apportionment of representatives violated the equal protection clause of the 14th amendment. It was held such an action could be entertained by a federal court, and the objection that such an action was nonjusticiable was overruled. Of course defendant is less interested in the holding in *Baker* than in the reasoning of the Court, which it says supports its contention. The Court observed in *Baker* that each of the varying formulations which may be used to describe a nonjusticiable political question "has one or more elements which identify [the question] as essentially a function of the separation of powers." The Court then listed the elements found in previous cases:

* * * Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a

lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. [369 U.S. at 217, 82 S.Ct. at 710.]

Defendant claims to find a sufficient number of these elements present in this case, saying that a decision in plaintiffs' favor on count I would (1) constitute a major incursion into the compensation-fixing responsibilities of the political branches, (2) involve the court in an area devoid of judicially discoverable and manageable standards for resolution, and (3) amount to the setting of judicial salaries by judges. Whether defendant's contentions regarding nonjusticiability would succeed to block judicial resolution of the count I claim based on a "pure inflation" theory we need not and do not decide, for such a claim is not one upon which we can grant relief.

Defendant's first point, that a judgment giving plaintiffs compensation in excess of that set by statute would impermissibly intrude into the responsibilities of the President and Congress, seems based on the notion that the Constitution commits the fixing of judicial compensation only to the discretion of the political branches. It is true that the Compensation Clause envisages the participation of both the legislative and executive branches in setting judges' salaries. However, as should by now be plain, the Clause goes on to declare that those salaries, once set, "shall not be diminished" while the judges continue in office. How can it be said that the matter of judicial compensation is totally committed by the Clause to determination by Congress and the President, without opportunity for judicial intervention, when the Clause contains language that pointedly limits the kind of determination they may make? We have already interpreted that Clause to provide protection against the diminution of the real value of judges' compensation in the event of a discriminatory attack on the judiciary. Is this protection, despite the Framers' intent that it should be a safeguard against overreaching by the political branches, to be left for them to observe or disregard at will, so that it becomes really no protection at all? We think not. Defendant cannot so easily read the limiting phrase out of the Clause. By the same token, it may not bar the courts from reading that phrase and giving effect to it in an appropriate case, for nothing in the Constitution (setting the Clause aside) expressly bars the courts from interpreting it.

In *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the Court read certain provisions of article I of the Constitution to decide whether the House of Representatives acted constitutionally in barring a Member from taking his seat. The Court did so despite the language of section 5 of that article, which declared that each House "shall be the Judge of the * * * Qualifications of its own Members." These words arguably "commit" to Congress the decision on whether a Member may be seated far more strongly than do the words of the Clause, with their limiting content, "commit" to the political departments alone the protection of judges' compensation and the determination whether diminishment of compensation exists. The Court in *Powell* reviewed in great detail the English parliamentary precedents on the seating of Members, concluding that the respective House of Congress, though the sole judges of their Members' qualifications, were confined in making their judgments to the qualifications established in express terms by the Constitution. Moreover, the Court thereby decided that it was the Court itself, as ultimate arbiter of the Constitution's meaning, that would determine the nature and extent of those qualifications, and not the Houses to which that determination was supposedly "committed." The present case is much more clearly an appropriate one for

judicial resolution, for the Compensation Clause does not in terms make Congress the "judge" of the existence or extent of salary diminution, though it does expressly forbid salary changes that amount to diminishments. The only history of the Clause's evolution presented to us by defendant was that already reviewed above, no part of which suggests that the courts have no role in interpreting it. Absent a convincing demonstration of "commitment" that runs counter to judicial intervention, the courts remain the final interpreters of the Constitution's commands, including the Compensation Clause.

■ For this court to adjust judicial salaries in face of a valid claim of discriminatory attack would not require it to make an initial policy determination of a legislative or executive nature. The only initial determination needed—the real value of the judges' salaries in relation to the salaries of others, before the advent of the discriminatory practice—would already have been made by the political branches. Salary adjustment would likewise not show a lack of respect due the coordinate branches, for while the granting of relief would not be without frictions in the situation of discriminatory attack, the frictions would be those attendant to the discrimination itself rather than the relief. The respect due the political branches is, after all, a respect for their conduct within constitutional bounds. The rule of respect enunciated in *Baker* is not a prescription for deference in the face of unconstitutional action, which would be little more than an abdication of judicial responsibility.

Defendant's allegation that a decision on so much of count I as states a valid claim would constitute an unwarranted intrusion into the responsibilities of Congress and the President cannot stand. Likewise, we cannot agree that plaintiffs' claim should be ruled nonjusticiable for want of judicially discoverable and manageable standards. The standards for determining the existence of a discriminatory attack on the judiciary can hardly be called difficult to discern or apply. The federal courts have amassed considerable experience in discrimination claims of many varieties under the fifth and 14th amendments. Factual elements quite familiar to judicial proceedings—some combination of high inflation, substantial compensation increases for all but a narrow class, resulting economic burdens on the members of that class, an intent to work hardships on the class members and a plan to effect that end—would be called forth and weighed to ascertain if the political branches had violated their duty not to compromise judicial independence through financial means. Clearly, "the duty asserted can be judicially identified and its breach judicially determined." *Powell v. McCormack, supra,* 395 U.S. at 517, 89 S.Ct. at 1961; *Baker v. Carr, supra,* 360 U.S. at 198, 82 S.Ct. 691. The molding of relief may well present more of a problem. However, considering the imponderables involved in fashioning relief in such areas as reapportionment, school desegregation, antitrust, and Indian land rights, in all of which areas the courts have undertaken in the recent past to relieve violations of rights, the computation of a recovery for plaintiffs in the event they establish their discriminatory attack claim would be relatively simple.

The basis in the political question doctrine of defendant's third argument for nonjusticiability, that judges would be engaged in the task of setting their own salaries, is difficult to perceive. In part this seems to recall defendant's original disqualification objection, disposed of in the discussion under part I of this opinion. To the extent it is an independent objection, it has already been answered in our treatment of defendant's first criticism, that a decision on count I would amount to an incursion into the responsibilities of the political branches. In disposing of a discriminatory attack claim in plaintiffs' favor, the court would ultimately undertake to adjust judicial salaries. However, the court would not be doing so in a vacuum; informing and guiding the relief settled upon would not be only the surrounding economic circumstances, judicially proved, but also the treatment accorded to other classes, not subject to

discrimination, by the President and Congress. The initial policy determinations regarding the real compensation that judges should receive would always remain with the political branches. Defendant's third point, if it has any substance, fails to convince us that this case presents a nonjusticiable political question.

For the reasons stated in the foregoing discussion, we hold that plaintiffs' claim for salary payments beyond those authorized by statute, on the ground that they have been and are now subject to a discriminatory attack by the political branches in violation of the Compensation Clause, does not fall within the political question doctrine, but is judicially determinable.

## C.

■ We now consider whether the facts stated in plaintiffs' allegations and affidavits are of a tenor to warrant the granting of such relief as may be available under the Compensation Clause in the case of a discriminatory attack on the judiciary. To make out a case, plaintiffs need not show a direct diminution of judicial compensation, but the indirect diminution that they complain of must be of a character discriminatory against judges and, paraphrasing Justice Holmes, must work in a manner to attack their independence as judges. Plaintiffs need to demonstrate the existence of a plan fashioned by the political branches, or at least of gross neglect on their part, ineluctably operating to punish the judges *qua* judges, or to drive them from office despite the Constitution's guarantee of tenure in office "during good Behaviour." U.S.Const. Art. III, § 1 (hereinafter Tenure Clause). Whether, to merit relief, the discrimination must be intentional, or may be in effect only, we need not decide now.

Plaintiffs have not gone so far as to allege the ongoing execution, or even the formation, of a plan on the part of the political branches to attack the independence of the third branch by financial means. Indeed, the only affirmative act of which plaintiffs complain is the Senate's vote in March of 1974, adopting S.Res. 293, disallowing the President's proposed increases based on the 1973 Commission's recommendations. We deal below with the effect of this resolution. Whether a neglectful administration of the Government has effectively given rise to an assault on the judiciary would have to be determined by looking to all the circumstances, considering such elements as the state of the economy and the conduct of the judges themselves, but not necessarily according controlling weight to any one element.

■ Plaintiffs have quite naturally emphasized the extent of inflation from 1969 through the close of 1976, and the correlative increase of private and civil service wages and salaries while the judges' salaries have remained virtually frozen, to argue a congressional neglect of the judiciary discriminatory in nature and threatening to judicial independence. We note first that while the level of inflation in the United States since 1969 has been high, its effects serious, and its existence perhaps without precedent, it still has not reached the proportions of the problem in certain European and South American nations, nor does it in any way resemble the hyperinflation of Weimar, Germany, in the early 1920's, where fortunes in nominal dollars were reduced to pittances practically overnight. Certainly, were Congress not to budge on the nominal dollar salaries it allowed judges in the face of hyperinflation, while the earnings of most others rose in rough parity with the cost of living, the threat to the ability of the judges to stay in their posts would be so great that a demand for their relief under article III would be difficult to refute. But hyperinflation, fortunately, has not yet been our nation's problem, and plaintiffs' official salaries, though seriously diminished in real value, are not presently in danger of closely approaching point zero on the scale of 1969 dollar values.

In connection with the foregoing point, since the capacity of judges to render decisions independent of legislative and executive influence depends directly on their ability to remain in office despite the actions or the inaction of the political branches, we

also consider, as plaintiffs urge, the pattern of judicial resignations and reasons given therefor in recent years. One index of how tolerable the level of inflation is to judges in the absence of salary adjustments, and therefore how tolerable the policy of the political branches is in view of the economic circumstances, is the number of resignations submitted for largely economic reasons. Long ago Justice Story noted the integral relationship of the Compensation Clause and the Tenure Clause, the latter securing to judges, as we said above, their continuance in office "during good Behaviour." Without the one provision, he said, guaranteeing an undiminished compensation, "the other, as to the tenure of office, would have been utterly nugatory, and indeed a mere mockery." 2 Story on the Constitution § 1628 (5th ed. 1891). The two clauses are inextricably tied to one another in pursuit of securing judicial independence, and to allow the indirect diminution of judges' salaries to accomplish what the political branches are forbidden to do directly under the Tenure Clause would be to sanction a deplorable ruse at the expense of constitutional principle. If plaintiffs can demonstrate that the 7-year freeze on federal judicial pay has brought about or imminently threatens to bring about the general demise of tenure in judicial office, for want of means on the part of judges to meet the cost of living, they will have gone far toward showing the compromise of the Tenure Clause's integrity in the very fashion that its twin, the Compensation Clause, was designed to prevent, and thus will have gone far to make their case of assault on judicial independence by economic duress.

Plaintiffs, however, can point not to a mass exodus of officeholders from the federal bench, but only to the resignations of seven district and circuit judges whose affidavits are of record in the case, six of whom agreed that financial considerations played the most significant role in their decisions to resign. While these resigna-

tions, particularly for economic reasons, are greatly lamentable, they do not make out such a case of hardship and neglect as to breathe life into plaintiffs' claim of impending disaster. Obviously, this situation could change, and the demonstration of massive resignation for financial reasons would very differently color plaintiffs' contention, stating a more compelling case that the strictures of the Compensation Clause had been violated. Such a situation is not before us now, however, and it is unnecessary for us to comment further on judicial resignation as an element of plaintiffs' case, for their showing on this point is inadequate to merit relief.

The foregoing discussion of the level of inflation and the pattern of resignations has not focused on a prop of plaintiffs' claim, proof of which is essential to their success on count I, namely, the existence of a discriminatory attack on judges. While federal judges may well have borne the brunt of inflation in recent years, they have not been alone. They are part of a class, not large in relation to the total number of employed Americans, but numbering about 2,500 judges, civil servants on the Executive Schedule, and Members of Congress, and 20,000 GS–15 through –18 civil servants. If Congress intended to mount an attack on the independence of the judiciary by means of a salary freeze in the face of high inflation, why would it have included in the freeze the top level civil servants and even, to a lesser extent,[11] its own Members? While the presence of others in the salary-freeze class does not absolutely preclude the conclusion that the judges are not subject to a discriminatory attack on their independence, and we are thus constrained to look as we have at other factors (such as the rate of inflation and the resignation pattern) bearing upon their ability to maintain their independence, still the fact that judges are not alone in that class substantially weakens plaintiffs' allegations of discrimination. Reasons other than a desire to punish the judges or drive them from office

11. Members of Congress have in recent years given themselves substantial adjustments in staff, travel, and certain other tax-free expense allowances, all of which tend to ease the impact of inflation.

appear to lie behind the 7-year omission of a pay raise.

We cannot overlook, in passing upon plaintiffs' claim of discriminatory assault, two very significant circumstances that have led to the maintenance of judges' nominal dollar salaries at virtually their 1969 levels. First of all, Congress has been unwilling to grant pay increases to the highest paid officers of the Government for political reasons. The nation has had, and continues to experience, difficulty adjusting to the chronic presence of high inflation, and many citizens have channeled their irritations with this economic condition toward the Government, particularly the elected officials. The official reckoning with this situation out of the public purse, expressed in publicly paid salaries, has no doubt been quite a burden on Congress. Conjoined with the public bewilderment over and disdain of chronic high inflation has been a growing popular distrust of the Government itself, compounding the difficulties of adjusting top Government salaries, including those of the Members of Congress, to meet the needs of the times. The 1976 Report of the Commission described the political climate vividly, in commenting upon the congressional blockage of a proposed salary adjustment (an increase of roughly 5 percent) in September 1976:

> The people's representatives who voted this way surely were not obtuse; they knew the alarming facts. They had no desire to deny themselves, judges and executives a pay raise out of some real or imagined grievance. On the contrary, they knew the scope of the problem and the need for a solution—in the form of a substantial increase. But they also knew, better than anyone else in government, the mood of America, and they knew that the consequences in November for any Congressman who voted himself a pay raise in September—however justified— would be paid at the ballot box.

> \* \* \* \* \* \*

> \* \* \* American people had lost confidence in Government—despite a vastly improved climate of trust in the Presiden-

cy itself—noticeable since the end of the "national nightmare" [the Watergate scandal] in August, 1974. They did not trust their leaders. They did not believe them to be people of honor, integrity and probity. And they believed these defects to be most clear when the subject was money.

> \* \* \* \* \* \*

> \* \* \* [I]n the past decade, other and less healthy forces [than a historic skepticism of authority] had been at work which have greatly aggravated the unease about public officials and the reluctance to reward them with adequate compensation. This sentiment—whether called "anti-Washington feeling" by political observers (and successful politicians) or "alienation" by public opinion analysts and social commentators—has been easy to detect and, for the people's representatives, easy to act upon.

The second circumstance to be taken into account is the apparent judgment of Congress, beginning with the 1969 salary adjustments, that federal appellate judges, other than Supreme Court justices, should receive the same annual official compensation in dollars as the Members of Congress themselves receive, and that district judges should be paid somewhat less. The Commission recognized, and criticized, the existence of this "linkage" of salaries in its Report, *Recommendations: Part II, Compensation* at 4–5, but the President's budget message recommendations in January 1977 perpetuated the linkage. It is of course not our function to evaluate the political judgment of Congress and the President in this regard. We note this fact, along with the political pressures exerted upon Congress, simply to confirm that the circumstances surrounding this case suggest not a discriminatory assault upon the judicial branch, but the contrary.

Plaintiffs have made much of the 1974 action of the Senate in blocking President Nixon's salary increase proposals from taking effect. Viewed in light of the foregoing considerations, however, S.Res. 293 appears not a device by which Congress

sought to compromise the autonomy of judges—again, no discrimination shows from the face of the resolution, for it forbade pay increases alike to judges, top civil servants, and Members of Congress—but an action largely dictated by political concerns far removed from the judiciary. Plaintiffs' complaint that the resolution was wrongful in that it was affirmative action to maintain the inflation-caused salary diminution is of no import here, for only diminutions that are discriminatory and that attack judicial independence present grounds for relief under article III.

The Administrative Office of the United States Courts in 1976 told the quadrennial Commission that studies showed "a 50-percent increase in judicial salaries as a minimum would not be unreasonable and indeed would even fail to restore the purchasing power of judicial salaries to the level of March 1969. A salary increase ranging up to 60 percent would be more proper and within the range of salary increases authorized in other sectors of the economy since 1969." A judicial salary increase of 28.9 percent was suggested and approved by the political branches in January and February 1977. Obviously this falls far short of restoring the salaries of judges in terms of 1969 dollars and provides nothing at all to "catch up" on the back pay lost in the 7-year salary freeze. However, we conclude that the recent action demonstrates the belated good faith, nondiscriminatory efforts of the Congress and the Executive to secure a level of compensation to the judges that the public is willing to pay, inadequate as it may be for numerous cogent reasons of less political weight.

For want of any showing by plaintiffs that Congress and the President have, in purpose or in effect, acted toward the judiciary in a discriminatory fashion, aimed at attacking the independence of the judges, plaintiffs are not entitled to prevail on count I of the petitions.

III

*Count II—Constitutionality of Section 359(1)(B)*

■ Under the provisions of the Salary Act, all or part of the President's recommendations transmitted to Congress become effective automatically within a specified time, but only to the extent that:

(A) there has not been enacted into law a statute which establishes rates of pay other than those proposed by all or part of such recommendations,

(B) neither House of the Congress has enacted legislation [12] which specifically disapproves all or part of such recommendations, or

(C) both. [2 U.S.C. § 359(1) (1970).]

To the extent the recommendations of the President become effective, they modify, supersede, and render inapplicable any prior inconsistent provisions.[13]

As we noted before, the Commission met in 1973 and submitted its report on rates of pay to the President on June 30, 1973. The President submitted to Congress, in his next budget, recommendations that differed from and were lower than those of the Commission; specifically, under the President's recommendations, the dollar level of judicial salaries would have been augmented by 7.5 percent as of March 1974, by an additional 7.5 percent as of March 1975, and a final 7.5 percent as of March 1976. The President's recommendations would have taken effect as of March 1974 under the Act, except that on March 16, 1974, the Senate, acting alone under section 359(1)(B), adopted S.Res. 293 disapproving the President's recommendations in toto.

---

12. We construe the statute's language "enacted legislation" to mean "passed a simple resolution." It is beyond doubt that a single House of Congress cannot "enact legislation" in the sense of passing a statute (subject to the President's veto power) having the full force and effect of law in itself. However, the purpose of clause (B) is clear to all—the intention was to authorize the use of the simple resolution to block the otherwise automatic effectiveness of the President's recommendations—and we will not frustrate the intent of Congress in our reading of it. *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975).

13. 2 U.S.C. § 360 (1970).

Plaintiffs claim that section 359(1)(B), in that it allowed the Senate by legislative or "one-House veto" to neutralize the President's recommendations, is unconstitutional, and but for that unconstitutional exercise of authority, the recommendations would have been implemented.[14] Thus plaintiffs assert that they are entitled to the benefits of the President's recommendations.

Plaintiffs attack the one-House-veto provision on the grounds that to give effect to clause (B) would violate: (1) article I, section 1, which vests the legislative power of the United States, not in one House alone but in a Congress consisting of both a Senate and a House of Representatives; (2) article I, section 7, which reserves to the President the power to veto every order, resolution or vote to which the concurrence of the Senate and House of Representatives is necessary; and (3) the principle of the separation of powers and article II, section 1, which vests all executive power in the President.

At oral argument, the Department of Justice conceded the unconstitutionality of section 359(1)(B).[15] Therefore, in order to have both sides of these complex issues fully presented, the court extended an invitation to the President of the Senate and the Speaker of the House of Representatives to file briefs as amici curiae. This invitation was accepted, the briefs were filed, and have been considered by us in reaching our decision in these cases.

### A.

The only "one-House veto" we have before us is that contained in section 359(1)(B). The only instance of its use that is before us occurred in S.Res. 293, which

---

14. For articles critical of the constitutionality of the legislative veto, *see* Ginnane, *The Control of Federal Administration by Congressional Resolutions and Committees*, 66 Harv.L.Rev. 569 (1953), and Watson, *Congress Steps Out: A Look at Congressional Control of the Executive*, 63 Calif.L.Rev. 983 (1975) (hereinafter Watson). For articles supportive of the constitutionality of the legislative veto, *see* Cooper & Cooper, *The Legislative Veto and the Constitution*, 30 Geo.Wash.L.Rev. 467 (1962) (hereinafter Cooper & Cooper); Stewart, *Constitutionality of the Legislative Veto*, 13 Harv.J.Legis. 593 (1976); Cooper, *The Legislative Veto: Its Promise and Its Perils*, Public Policy: Yearbook of Public Administration, vol. VII, Harv.Univ. 1957, at 128–74; and Schauffler, *The Legislative Veto Revisited*, Public Policy: Yearbook of Public Administration, vol. VIII, Harv.Univ. 1958, at 296–327.

15. This concession by the Department of Justice does not bind the court or control our decision. It is settled that a confession of error by the Government, whole or partial, need not be accepted by a court if its independent examination leads it to another result. *See Young v. United States*, 257, 258–59, 62 S.Ct. 510, 86 L.Ed. 832 (1942); *Sibron v. New York*, 392 U.S. 40, 58–59, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

While the Department of Justice vigorously defended the suits on other grounds, this concession is by no means surprising; the Department, representing the intervening plaintiff-United States, presented arguments against the legislative veto in *Clark v. Valeo*, 559 F.2d 642 (D.C.Cir. 1977). As an arm of the Executive, the Department of Justice mirrors the longstanding objections of all recent Presidents against what is viewed as an incursion into the constitutional domain of the Presidency. *Cf.* Wilson: 59 Cong.Rec. 7026–27, 8609 (1920; Hoover: 76 Cong.Rec. 2445 (1933); Roosevelt: H.R.Doc. No. 252, 75th Cong., 1st Sess. (1937); 83 Cong.Rec. 4487 (1938); 90 Cong.Rec. 6145 (1944); Jackson, *A Presidential Legal Opinion*, 66 Harv.L.Rev. 1353, 1357–58 (1953) publishing a confidential opinion by President Roosevelt; Truman: 97 Cong.Rec. 5374–75 (1951); 98 Cong.Rec. 9756 (1952); Eisenhower: 100 Cong. Rec. 7135 (1954); 101 Cong.Rec. 10459–60 (1955); *Public Papers of the Presidents of the United States: Dwight D. Eisenhower*, 1956, at 648–50 (1956); H.R.Doc. No. 255, pt. 1, 86th Cong., 2d Sess. M18 (1960); Kennedy: *Public Papers of the Presidents of the United States: John F. Kennedy*, 1963, at 6 (1964); Johnson: *Public Papers of the Presidents of the United States: Lyndon B. Johnson*, 1963–64, at 861–62, 1249–51 (1965); 1 Weekly Comp.Pres.Docs. 132, 432–33 (1965); 111 Cong.Rec. 12639–40 (1965); Nixon: 8 Weekly Comp.Pres.Docs. 938, 1076 (1972); 9 Weekly Comp.Pres.Docs. 1285–87 (1973); Ford: 10 Weekly Comp.Pres.Docs. 1279 (1974). Statutes containing legislative vetoes have also been the subject of critical opinions of several Attorneys General, 37 Op.Atty. Gen. 56 (1933); 41 Op.Atty.Gen. 230 (1955); *id.* at 300 (1957).

While the President has on occasion withdrawn condemnation of the veto device, when a specific power was desired of Congress, the overall reaction of the Executive has been denunciation. Watson, *supra* note 14, at 988 nn. 9–12.

disapproved the whole of the President's recommendations. We are not to consider, and do not consider, the general question of whether a one-House veto is valid as an abstract proposition, in all instances, across-the-board, or even in most cases. As the District of Columbia Circuit appropriately said in *Clark v. Valeo*, 559 F.2d 642 at 650 (1977): "Clearly, the question of legislative review of Executive and administrative agency actions is a sweeping subject to be treated in a gingerly fashion by the courts. Review of various legislative review mechanisms ought at an absolute minimum be informed by experience and not depend solely on abstract analysis or speculation." Our consideration must center, then, on this specific mechanism in this specific statute—how it works, what it involves, what values and interests are implicated—not on an overarching attempt to cover the entire problem of the so-called legislative veto, or even a large segment of it. This is not a pious or routine disclaimer. Our analysis will be narrowly confined to section 359(1)(B) and there will be no attempt to suggest or forecast the fate of other situations or other statutes.[16]

■ The one-House veto in the Salary Act calls for two fundamental inquiries in testing the validity of plaintiffs' attack: first, does the device, as used in that statute, conflict with the constitutional powers and obligations of Congress as a whole, acting through both Houses; and, second, does the device invalidly intrude on the constitutional sphere of the President. To us, the answers to these questions are dominated by several special factors. First of all, the pay of Members of Congress, of judges and justices, and of high-level executive, judicial, and legislative officers is, his-

torically and intrinsically, at the heart of Congress's own competence and concern. Though the Act initially vests the pay-setting function in the Commission and the President, that function has historically resided in the legislative branch, not in the executive. Secondly, and despite the foregoing, the fixing of pay scales, including those of Members of Congress and of judges, may properly be delegated to the President. Third, in making such a delegation in the Act, Congress was much concerned with its own pay and with the relationship of its own pay to that of the judges and other officials.[17] The legislative history reveals quite considerable concern with congressional pay. *See* 113 Cong.Rec. 28642, 28643 (Congressman Udall); 28644 (Congressman Holifield); 35839 (Congressman Udall); 36101–02, 36107–08 (Senator Monroney). *See also* part II, *supra*. The fourth factor follows naturally from the above: although it wished to delegate, Congress was intent on retaining a large measure of control over the pay levels set by the Commission and the President. This is also very clear in the excerpts from the debates cited above. Members of both Houses were assured that the ultimate say would be with Congress. The same objective is manifest from the provisions inserted into the Act for overruling the President's recommendation. 2 U.S.C. § 359(1), *supra*. The fifth and final element that we consider is closely linked to the first. It is that the President's salary proposals, even when they become law, do not order or regulate any person, either actually or potentially. The recommendations do not affect the rights of others, require them to do anything, impose any obligations on them, or restrict any pre-existing rights or privileges of anyone

---

**16.** This discussion may well be rendered academic for future pay adjustments under the Act. Pub.L. 95–19, enacted Apr. 12, 1977, amends the statute under consideration to remove the one-House veto device and to substitute in its place the requirement that both Houses affirmatively approve the President's salary recommendations before they can become effective. We, of course, express no opinion on the construction or constitutional validity of the recent amendment.

**17.** The Act mandates, 2 U.S.C. § 356, the Commission to review the specified rates of pay for the purpose of determining and providing "(i) the appropriate pay levels and relationships between and among the respective offices and positions covered by such review, and (ii) the appropriate pay relationships between such offices and positions and the offices and positions subject to the general pay schedules for federal employees.

other than those whose pay is thereby established.

We proceed to take account of the above factors in appraising the one-House veto in the Act, and particularly in considering plaintiffs' specific arguments against it. There is no dispute that the fixing of compensation for judges, along with the establishing of congressional pay, are powers constitutionally lodged in Congress. Article III, section 1, does not state by what means judges should be compensated, but the appropriation authority granted Congress under article I, section 9, clause 7,[18] confirms its authority to fix the level of compensation. The Supreme Court has noted (as we quoted in part above):

> The words and history of the clause [article III, section 1] indicate that the purpose was to impose upon Congress the duty definitely to declare what sum shall be received by each judge out of the public funds and the times for payment. When this duty has been complied with the amount specified becomes the compensation which is protected against diminution during his continuance in office.
>
> \*　\*　\*　\*　\*　\*
>
> The power of Congress definitely to fix the compensation to be received at stated intervals by judges thereafter appointed is clear. \*　\*　\*.

*Miles v. Graham, supra,* 268 U.S. at 508–09, 45 S.Ct. at 602. The same is true of the pay of Senators and Representatives under article I, section 6,[19] of the Constitution. Since the beginning of our national life under the Constitution, the establishment of pay scales for these officials has been very close to Congress's heart.

Nonetheless, this particular power, though legislative in character, can be delegated under proper standards, at least so long as Congress retains the ultimate authority. No one participating in this litigation has suggested otherwise, or that the Commission-presidential mechanism for setting pay levels under the Act is invalid (aside from the one-House veto). A three-judge district court for the District of Columbia has recently upheld the procedure of the Salary Act, as well as the Executive Salary Cost-of-Living Adjustment Act of 1975, *supra,* with respect to congressional salaries. *Pressler v. Simon* (D.D.C. decided Oct. 12, 1976), 428 F.Supp. 302, on appeal to the United States Supreme Court, No. 76–1005.[20] For both judicial and congressional compensation, we have no doubt of the validity of a hypothetical statute which established the same mechanism as the Salary Act but dispensed with the one-House veto, providing only a specified layover period to allow Congress to enact an overriding statute in ordinary course. *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), stands for at least that much.[21] Accordingly, there is nothing invalid in the establishment by the Salary Act of an advisory Commission, or of the provisions for a presidential recommendation on salaries, for the layover period, for the overriding of the presidential recommendation by a regular statute, and for giving effect to the presidential proposal if Congress takes no

---

**18.** "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

**19.** "The Senators and Representatives shall never receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. \* \* \*."

**20.** Plaintiff Pressler was a Member of the House of Representatives who alleged that his vote, in ascertaining said compensation, was diluted by the procedure established under the

Act. The *Pressler* case did not consider the one-House veto.

**21.** In *Sibbach v. Wilson & Co.,* the Supreme Court approved the principle that rules proposed by the Court could be statutorily required to be laid before Congress for possible disapproval by statute before becoming effective. Plaintiffs argue that this precedent shows that Congress can delegate power to the federal courts to make rules and to require that these rules be sent before the whole Congress, to allow for enactment of a law disapproving such rules, if Congress so wishes. Thus, in plaintiffs' view, *Sibbach* merely reaffirms the validity of clause (A) of 2 U.S.C. § 359(1).

action at all (as happened in 1969 and 1977). The sticking-point is solely the one-House veto.

The problem, then, becomes one of the propriety of the manner in which Congress has chosen to exercise its pay-setting authority with respect to judges under the Act. What is the constitutional underpinning of section 359(1)(B), the one-House veto device used here? It is a combination of article I, section 1, placing the legislative power in Congress, and article I, section 8, clause 18, the so-called "necessary and proper" clause, vesting in Congress the power:

> To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers [the enumerated powers of section 8], and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

Article I, section 1, endows Congress with the broadest reach of power in this instance, so long as executive functions are not infringed and presidential veto rights not compromised, because the subject of the one-House veto, the salaries of judges and congressmen and other Government officers, is at the center of the congressional sphere. On this foundation, the necessary and proper clause authorizes Congress to choose, first, to delegate the initial power to make proposals to the President, and, then, to select for itself the appropriate method for checking and monitoring the President's action.

■ It is perhaps trite, but nonetheless relevant, to repeat the tests of validity of congressional enactments under the necessary and proper clause, as stated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional." 17 U.S. (4 Wheat.) at 421. The necessary and proper clause authorizes Congress "to exercise its best judgment in the selection of measures,

to carry into execution the constitutional powers of the government," 17 U.S. (4 Wheat.) at 420, and "avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances," 17 U.S. (4 Wheat.) at 415. As the District Court for the District of Columbia recently said in *Pressler v. Simon, supra*, 428 F.Supp. at 306:

> Repeatedly during the discussions preceding its adoption, our founders sought to preserve in the Constitution a flexible approach to government that would facilitate accommodation to changing conditions and experience. The Constitution is not to be parsed in the narrow, rigid, pedantic manner of a statute. It must remain flexible and adaptable, placing reliance upon the checks-and-balances built into our tripartite format and the sound attitude of voters expected at the polls. The "necessary and proper" clause of Section 8 of the same Article is but one expression of this sound approach. *McCulloch v. Maryland*, (17 U.S.) 4 Wheat. 316, 4 L.Ed. 579 (1819).

■ Where there has been no violation of separation-of-powers principles or of any specific provision of the Constitution, the necessary and proper clause can authorize a given method of obtaining a desired result, as well as ground a substantive provision (as in *McCulloch*). We therefore see no reason why the one-House veto should fail of authorization unless one of plaintiffs' three criticisms of the device listed above establishes such a violation. Thus we proceed to consider the merit of those criticisms, coming to the conclusion that the one-House veto in the Act before us is valid and that its use in this instance is not forbidden by anything in the letter or spirit of the Constitution.

### B.

Plaintiffs contend first, that the one-House veto conflicts with article I, section 1, of the Constitution, which provides:

> All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

The alleged contravention of article I, section 1, by the Act arises from plaintiffs' syllogism that: (1) Congress possesses only the powers delegated by the Constitution; (2) the Constitution delegates only *legislative* power to Congress; (3) all legislative power is delegated to *both* Houses, acting bicamerally; (4) the one-House veto is either a legislative act, or it is not; (5) if it is not legislative, it is beyond the power of Congress; (6) if it is legislative, Congress must follow the constitutionally prescribed legislative route, which involves action by both Houses.[22] In considering plaintiffs' arguments, we must first determine if Congress can perform in a manner that does not require affirmative bicameral action. If so, then the legislative veto in issue here must be examined to see if it falls within that class of acts of Congress which must be performed via the scheme of concurrent action by both Houses, plus presidential approval or veto, or is properly exercisable by a single House.

As plaintiffs obviously concede, the Constitution does make specific grants of authority to a single House acting alone. The House of Representatives and Senate have individual tasks, such as impeachment and approval of appointments and treaties. Additionally, each House is granted the power to judge the elections and qualifications of its Members, to determine the rules of its own proceedings, and to punish its Members for unacceptable behavior. Plaintiffs would differentiate these activities since they are approved in the Constitution. However, plaintiffs' formulation ignores other long-standing practices. Congress can express its opinion through resolutions which are not subject to presidential veto, even though such power is not expressly granted in the Constitution. Another power which Congress is acknowledged to have is the power to carry on investigations, even though this too is not expressly provided for in the Constitution.[23] More importantly, congressional committees can and do exercise power ancillary to legislation within the sphere of activity committed to them by Congress. In so doing, these committees make decisions independent of congressional action as a whole and which have great policy significance. These include decisions on which of the many bills referred to them to take up and consider, whether and when to report matters to the floor, or how far to carry an investigation.[24] All of these activities by the Houses of Congress are constitutionally proper, as within the legislative power, but do not require affirmative bicameral action.

■ It follows, in our view, that article I, section 1, does not automatically call for affirmative bicameral action every time a legislative power or function is being exercised or authorized. The purpose of the clause is to locate the central source of legislative authority in Congress, rather than the Executive or the Judiciary. But the clause does not itself, as a textual matter, mechanically direct the manner in which Congress must exercise the legislative power. On that problem, the core purpose of the clause must, of course, be taken into account (as it is in appraising the extent of appropriate delegation), but there are also other pertinent considerations, including the reach of the separation-of-powers doctrine and of the necessary and proper clause, as well as the constitutional sphere of the Executive. There is no textual or linguistic solution which declares, in self-operating fashion, that everything Congress can do or authorize under article I, section 1, must necessarily be done by itself

---

**22.** Plaintiffs' brief in response to the briefs of amici curiae, at 2–3.

**23.** Cooper & Cooper, *supra* note 14, at 473–74.

**24.** *Id.,* at 477. Many policy choices are made within Congress which do not call for bicameral action and are not susceptible to presidential veto. The decision not to introduce a bill, or not to vote on a bill once introduced, is an example. Laws are allowed to lapse and not reenacted. On the level of other actions taken by less than the full Congress, the House of Representatives can refuse to introduce legislation authorizing the raising of revenue; and the comments of a single Congressman or Senator can often result in changed policies, not only throughout the Federal Government, but in the private sector.

through a statute passed by both Houses, or through other bicameral action. Article I, section 1, does indeed call upon Congress to confine itself to legislative matters, but the clause allows some measure of leeway for the manner in which Congress fulfills the legislative function.

 Just as we conclude that Congress may perform in a manner that does not require affirmative bicameral action, we likewise decide that the one-House veto here in controversy—being confined to the matter of salaries traditionally within the peculiar province of the legislative branch, not impinging upon presidential functions or veto rights, and having no effect upon persons other than those whose salaries are at issue—does not fall within the class of acts that Congress must perform through the affirmative concurrence of both Houses, but rather is properly exercisable by a single House. We reach this decision by virtue of the simple fact that the single House, in voting by a majority to block the otherwise automatic effectiveness of the President's recommendations, is not doing anything for which the Constitution requires the concurrence of both Houses. The single House is certainly not making new law.[25] Plaintiffs seem to think that the House, when it casts its "veto," is attempting to make law, which act they define as one that "repeals, modifies, or amends the law." However, even accepting that definition for the sake of argument, plaintiffs' view is erroneous, for the one-House veto does not alter the existing law in any fashion, but only preserves the legal *status quo*. Plaintiffs' error is traceable back to the faulty assumption that the President's recommendations themselves are automatically the law, which the single House's action of veto then changes. But, at the most, the Act accords the President's recommendations only the potentiality of becoming law—if neither House objects within 30 days of their announcement—and does not give them the force and effect of law *ab initio*.

Plaintiffs would have us breathe into the President's recommendations, on the day they are announced, the vitality and force of a statute, when in reality they were not. The Act did not authorize the President to issue an order or to promulgate a regulation establishing new salaries for Members of Congress, judges, and other officials. When the Senate adopted S.Res. 293, there was no formal lawmaking; all that occurred was a rejection of the President's recommendations in the manner provided in the Act. Had neither House approved a resolution withholding effectiveness from the new salary rates, they would indeed have become the law with the running of time, but it is essential to realize that they would have done so, and received the authority for their effectiveness, not in and of themselves, but solely through the mandate of the Salary Act, which was a statute enacted by both Houses of Congress and signed by the President. The recommendations could have become law, because the Salary Act so authorized, but one cannot ignore the fact, in determining the legal *status quo* on the day that S.Res. 293 was adopted, that the Act did not make them law automatically, but only gave them that effect absent objection from either House of Congress. Under the Act's own terms, by virtue of the passage of the resolution, no new salary law was enacted in 1974, nor was there a modification or repeal of any existing salary law. The previously enacted statute fixing judicial salaries remained unchanged and still in effect at that time.

It is important to note that the one-House veto is not, in the context of the present case, a device employed or available for the circumvention of the Constitution's scheme for the enactment of statutes. Further, it neither expands nor contracts the powers of either House of Congress severally. When a single House negatives the President's recommendations, as the Senate did by S.Res. 293, precisely the same result is reached as if one House voted down a proposal for new legislation: there is no change in the law. If no more than a minority in each House opposes the recom-

25. *See* note 13, *supra*.

mendations, the salary changes become effective, just as if a majority in each House had concurred in them and the President approved them (which of course can be assumed in light of his role in initiating them), the traditional course of legal change by statute. The President and the two Houses enjoy exactly the same say in what the law is to be as would have been true for each without the presence of the one-House veto, and nothing in the law is changed absent the concurrence of the President and a majority in each House. It is not as if the "veto" is imposed by one committee of Congress or one member. One of the two congressional bodies must itself be directly involved. Nor could one House do anything more than preserve existing law; it could not, for instance, increase or decrease the salary levels recommended by the President. And since the device is a one-House "*veto,*" one House could not put the proposals into effect by approving them if the other disapproved.

Without question Congress could have provided only for presidential salary recommendations (after Commission proposals had been considered) which would become effective if not overturned by a statute enacted in the ordinary course, as Congress did in fact legislate in clause (A) of section 359(1). But it wanted, because of the great importance of the matter to it and the many obstacles to passage of a statute, to retain some easier measure of control which would still reflect, in a substantial way, the sense of Congress as a whole. Thus it came

to the one-House veto which, unlike a statute, could do no more than negate the President's recommendations, leaving salary levels as they were in the existing law.[26]

We therefore find no conflict between article I, section 1, and the one-House veto in the Act before us, in light of the arguments presented by those attacking the subject provision.

## C.

Article I, section 7, clause 3, of the Constitution provides:

> Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

Plaintiffs' second attack on the constitutionality of section 359(1)(B) derives from its alleged offensiveness to article I, section 7, clause 3, the second of the so-called presentment clauses.[27] Specifically, plaintiffs view the one-House-veto provision of the Act as objectionable in that it usurps the President's constitutional right to have sole veto power over the laws.

The historical formulation of the President's veto power is well-known and docu-

---

**26.** Plaintiffs further claim that the Act is defective in that it purports to authorize partial, not just total, disapprovals of the President's recommendations. It is said that conflicting disapprovals could result, leaving the extent of the change in the law, if any, in doubt. Plaintiffs' criticism may well go only to a defect in draftsmanship. However, we decline at this time to pursue the point in any greater detail, for in the case now before us we have only an exercise of the one-House veto that disallowed the whole of the President's recommendations. Also, *see* note 16, *supra.* Had Congress disapproved the recommendations only in part, the court might have been required to address not only the legal effectiveness under the Act of what had not been disapproved, but also the constitutionality of the statute's language permitting only

partial rejections by each House of Congress (a matter distinct from the constitutional inquiry undertaken in this opinion). But the facts of this case neither require nor permit us to discuss the problem of the hypothetical partial disallowance. *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

**27.** The first presentment clause is article I, section 7, clause 2: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; * * *." [Thereafter follows the procedure for the exercise of the President's veto and its overturn by Congress.]

mented[28] and needs no repetition here. It is sufficient to note that the veto power was not restricted merely to legislative items which are captioned bills. Rather, the language of the Constitution was broadened, so that Congress cannot avoid the Executive's veto power simply by restyling legislative acts. Nor is there any quarrel with plaintiffs' exposition that the purpose of the veto is to forestall congressional encroachment on the executive power and to act as a check against unwise or hastily conceived legislation. The tyrannies of a monarchy had been freshly expelled and the Framers naturally feared a return of monarchistic practices. There was great concern among them that the legislature, and not the executive, would tend to excesses. Therefore, the confinement of congressional power was a fundamental part of the Framers' attempt to constrain federal authority as a whole. This feeling was echoed by Alexander Hamilton:

> * * * The tendency of the legislative authority to absorb every other, has been fully * * * illustrated * * *. In governments purely republican, this tendency is almost irresistible. * * *.[29]

Madison warned:

> * * * it is against the enterprising ambition of this [legislative] department that the people ought to indulge all their jealousy and exhaust all their precautions.[30]

It is clear to us that the one-House veto in the Salary Act does not fall afoul of either the words or spirit of article I, section 7, clause 3. The text applies solely to actions "to which the Concurrence of the Senate and House of Representatives may be necessary," and we have already pointed out that the exercise of the legislative "veto" is not an act requiring such a concurrence. The language of the Constitution's second presentment clause simply does not apply in this instance.

As for the policy of preserving the President's veto power vis-á-vis Congress, the problem handled by this particular Salary Act reflects perhaps the least need for such a veto with respect to rejection of presidential pay recommendations. The Salary Act itself was, of course, presented to the President for his approval or veto. We have emphasized that the subject matter of 2 U.S.C. §§ 351, et seq. ("Commission or Executive, Legislative and Judicial Salaries") has historically been within the primary domain of Congress, not of the Executive. There are no elements of the regulation or enforcement of, or of the planning or carrying on of, an ongoing or continuing program, or of interference with executive discretion in new or existing programs of substantive character. No rights of others than the officials are concerned, and no rights or duties are laid upon others. The President does participate through making his recommendations and those cannot be increased or decreased without further chance for participation by him; one House can do no more than vote down the presidential suggestions, and if that happens, the existing pay scale remains in effect. The President will, of course, take account of congressional views in making his pay recommendations, but he would do this in any event, and here the nature of the subject matter makes it peculiarly appropriate that he do so. But he is not forced to recommend any increase or decrease; he can simply propose no change in existing law. If he does that, a statute will be necessary to modify the rates of pay (in the case of judges, only to the extent constitutionally allowable). All in all, the possibility of undue legislative encroachment on the Executive—the focus of the Framers' stress on the veto power—is minimal in this situation.

### D

Article II, section 1, of the Constitution provides:

> The executive Power shall be vested in a President of the United States of America. * * *.

---

28. Watson, *supra* note 14, at 1045 ff.

29. The Federalist No. 71, at 304.

30. The Federalist No. 48, at 218.

By far the most broadly drawn assault, and hence least conducive to precise exposition, is plaintiffs' condemnation of the legislative veto in this statute as violative of the principle of the separation of powers, as well as of article II, section 1, of the Constitution. The principal objections on this score are rooted in plaintiffs' analysis that: (a) legislative power "to adjust salaries" once delegated by Congress becomes an executive power, and Congress can then no longer meddle in the execution of that power; if Congress is displeased with the results of the administration of the power, it must act through a new statute; (b) the legislative veto in the Act abrogates the President's constitutional duty to faithfully execute the laws; (c) Congress can delegate power, and can even delegate power with conditions, but it cannot affix an unconstitutional condition upon the delegation, *i. e.,* review or veto by one House; and (d) the legislative veto involves Congress in day-to-day administration and hence expands the role of legislators into administrators in violation of article I, section 6, clause 2.

■ 1. Before it can be determined that one of the coordinate branches of Government has transgressed and sought to appropriate a power that is properly exercised elsewhere, it is fitting to consider how powers are constitutionally apportioned among the three branches. However, a workable categorization has eluded even the most perspicacious of minds:

* * * Experience has instructed us that no skill in the science of government has yet been able to discriminate and define, with sufficient certainty, its three great provinces—the legislative, executive, and judiciary; or even the privileges and powers of the different legislative branches. Questions daily occur in the course of practice, which prove the obscurity which reigns in these subjects, and which puzzle the greatest adepts in political science. [The Federalist No. 37, at 153 (J. Madison).]

Many analytical frameworks have been proposed to assist the classification of powers in their respective branches. None of these mechanistic simplifications provides a useful yardstick for this case.

In my judgment, it is completely futile to try to draw any sharp or logical line between legislative and Executive functions, as if the mere description of the function inexorably caused it to fall under one or the other heading.

\* \* \* \* \* \*

Instead of attempting to establish a rigid classification of governmental functions as executive or legislative, it is more fruitful to examine the manner in which the Constitution distributed powers between the President and Congress.[31]

Justice Frankfurter reflected that the separation-of-powers principle is a political maxim, not a technical rule of law.[32] A necessary aspect of this realization that constitutional powers cannot be neatly ascribed for all time to one or another branch is that such powers are shared. As Justice Jackson noted in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952):

The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contem-

---

**31.** Rehnquist, *Committee Veto: Fifty Years of Sparring Between the Executive and the Legislature,* Remarks before the Section of Administrative Law of the American Bar Association, Dallas, Texas (Aug. 12, 1969), cited and quoted in Watson, *supra* note 14, at 991.

**32.** F. Frankfurter, The Public and its Government 77 (1930); also therein at 78:
"On the whole, 'separation of powers' has been treated by the Supreme Court not as a technical legal doctrine \* \* \*. Functions have been allowed to courts as to which Congress itself might have legislated; matters have been withdrawn from courts and vested in the executive; laws have been sustained which are contingent upon executive judgment on highly complicated facts \* \* \*. Enforcement of a rigid conception of separation of powers would make modern government impossible."

plates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. * * *.

That the Constitution expects a certain blending of powers has been recently reiterated by the Supreme Court:

> * * * The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively. [*Buckley v. Valeo*, 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976).]

Since the separation-of-powers doctrine does "not establish and divide fields of black and white" and does not "carry out the distinction between legislative and executive action with mathematical precision,"[33] the doctrine is best understood in light of its purpose:

> * * * The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny. * * *. [The Federalist No. 47, at 211 (J. Madison).]

As long as accumulation is avoided, the Constitution brooks some flexibility in the character of the power disbursed to each branch. As Professor Kenneth Culp Davis says (1 K. Davis, Administrative Law Treatise § 1.09, at 68–69 (1958)):

> What we have discovered in facing such problems—and we have by now had a good deal of experience—is that the true principle that should guide the allocation of power within the general framework is not the principle of separation of the three kinds of power but is the principle of check.

The danger is not blended power. The danger is unchecked power.

> * * * As long as we continue to emphasize the principle of check, we may safely continue our increasingly deepseated habit of allowing the blending of three or more kinds of power in the same agency.

For an eloquent statement of the principle of check, see The Federalist No. 51 (J. Madison).

The Constitution, in its grants of enumerated powers, limits some kinds and exercises of powers specifically to one branch; but since the legislative veto is not specifically approved or condemned by the Constitution, it can only be evaluated in the context of detailed constitutional objections, rather than by a sweeping castigation that the use of the legislative veto represents an unwholesome shifting of power from the executive to the legislature. We are not concerned with the desirability of the legislative veto and, as we have said, limit our consideration to the constitutional permissibility of the single one-House veto in this particular Act.

 2. As previously stated, plaintiffs' argument is that once Congress has delegated a power, the nature of that power becomes executive; and since Congress cannot itself execute the laws, it can no longer interfere in the performance of that power unless it passes a law withdrawing or modifying its grant. The nub of this argument stems from a rigid segregation of powers into executive and legislative, a categorization we deem unilluminating in determining whether the exercise of a power by a given branch is constitutional or not. If plaintiffs' contention is that the only role of Congress is to legislate and set policy, and having done so, necessarily cedes all further review of the execution of that policy, the position is untenable. We assume that plaintiffs do not question the long-established principle that Congress

---

**33.** *Springer v. Philippine Islands,* 277 U.S. 189, 209, 211, 48 S.Ct. 480, 485, 72 L.Ed. 845 (1928) (Holmes, J., dissenting).

may seek assistance from another branch of the Government by delegating authority to the executive branch or to administrative agencies under proper standards, and thereby to direct the details of the execution of the authority granted. *Hampton & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928). Unless Congress invades a power specifically granted to the President in the Constitution, such as the power of appointment, or fails to provide guidelines, no separation-of-powers problem arises from such a delegation. Moreover, when Congress delegates authority of the kind we have here to a member of the executive branch, the delegation does not convert the authority granted into an irrevocable executive power, because in exercising the delegated functions, the executive officer merely acts as an agent of the legislative branch of the Government. This is particularly true when, as here, Congress utilizes an executive officer or administrative agency to make investigations and reports for the ultimate information of Congress. *Sunshine Coal Co. v. Adkins,* 310 U.S. 381, 398, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *Humphrey's Executor v. United States,* 295 U.S. 602, 628, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). To plaintiffs' argument that Congress cannot meddle once it has delegated power, it may be observed that legislation is itself a form of supervision. Congress has two roles: initial formulation of policy and supervision. The only pertinent question is in what manner Congress can oversee. In this case, whether the answer is by full-fledged statute or by one-House veto, there would be neither a violation of the separation-of-powers principle nor an invalid intrusion on executive power since the pay-setting function is basically legislative in character and embodies no substantial element of, or incursion into, the administration, enforcement, or execution of the laws.

3. The delegation of power to the President to make recommendations as to pay under the Act is also said by plaintiffs to be subject to an unconstitutional condition, namely, review and veto by less than the full Congress. Since it is beyond cavil that Congress can delegate power conditionally, our concern is the validity of the condition. In *Currin v. Wallace,* 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939), the Supreme Court upheld a statutory scheme whereby Congress delegated to the Department of Agriculture the power to inspect tobacco, subject to the condition that the farmers in the relevant area voted to subject their tobacco to such inspection. Plaintiffs do not challenge the correctness of this decision any more than they attack the validity of delegations of power conditioned upon a finding by the executive or an agency that a certain situation does or does not exist, or upon the happening of an ascertainable event.

■ The doctrine of unconstitutional conditions has been applied to legislative acts which grant benefits on conditions which require the recipient to relinquish his constitutional rights.[34] No case has been cited, and we have found none, in which the separation-of-powers doctrine is involved with a legislative grant that is made subject to unconstitutional conditions. The doctrine of unconstitutional conditions is in no way pertinent to this case, because as we have suggested repeatedly, the ultimate power with respect to judges' and others' salaries—and that is all that is involved here—is vested by the Constitution in Congress and not in the President.

■ 4. Under article II, section 1, the President is vested with the executive power. In decrying the legislative veto as an abrogation of this constitutional "power," plaintiffs propose an expansionist construction of this provision, conferring on the President implied powers which in some way are transgressed by the one-House veto in the Salary Act. In *Youngstown Sheet & Tube Co. v. Sawyer, supra,* the Solicitor General urged the Supreme Court to interpret article II, section 1, as a clause which

---

34. *Cf. Another Look at Unconstitutional Conditions,* 117 U.Pa.L.Rev. 144 (1968). The doctrine usually arises in first amendment cases; see *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

"constitutes a grant of all the executive powers of which the Government is capable." In his concurring opinion, Justice Jackson responded to this notion as follows:

* * * I cannot accept the view that this clause is a grant in bulk of all conceivable executive power but regard it as an allocation to the presidential office of the generic powers thereafter stated. [343 U.S. at 641, 72 S.Ct. at 873.]

The case before this court does not involve any of the powers *enumerated* in article II, and we do not see how any of such powers are infringed by this legislative veto. The Court's opinion in *Youngstown* rejects the view that the opening sentence of Article II, section 1, is a general grant of the fullest executive power to the President:

Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the President. In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he things bad. And the Constitution is neither silent or equivocal about who shall make laws which the President is to execute. The first section of the first article says that "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ." After granting many powers to the Congress, Article I goes on to provide that Congress may "make all Laws which shall be necessary and proper

for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." [Id. at 587–88, 72 S.Ct. at 867.] [35]

Whatever power the President exercises under the Salary Act, comes not from article II but from the delegation of Congress pursuant to the necessary and proper clause. The last portion of that clause affirms the power of Congress to enact such laws as shall be necessary and proper to carry into execution the powers vested by the Constitution "in any Department or Officer thereof." The President is an "Officer thereof." [36]

5. Plaintiffs likewise declare that the Act allows one House of Congress to administer the laws, and, in assuming this executive role, violates article I, section 6, clause 2:

No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

Plaintiffs urge the court to find that the veto is unconstitutional, because it vests Members of the Congress with executive power and makes them officers contrary to the prohibition established in the last clause of the paragraph. Chief authority for this

**35.** The decision of the Supreme Court in *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), is not to the contrary; Myers was a postmaster of the United States. The President demanded, through the Postmaster General, his resignation. Myers protested since section 6 of the Act of July 12, 1876, conditioned removal of his class of appointees on the advice and consent of the Senate. The Court held that the President had the unconditional right to remove Myers, and the Act violated article II, section 2, which allows the Senate a voice only in the selection, but not removal of presidential appointees. While there is some dicta to the effect that article II, section 1, is an affirmative grant of the execu-

tive power, cf. 272 U.S. at 151, 163, 47 S.Ct. 21, the offensiveness found in that statute stemmed from its contravention of one of the President's *enumerated* article II powers and not the broad language contained in the opening sentence of article II, section 1.

**36.** For a definitive study on the importance of this last portion of the necessary and proper clause, *see* Van Alstyne, *The Role of Congress in Determining Incidental Powers of the President and of the Federal Courts: A Comment on the Horizontal Effect of "The Sweeping Clause,"* 36 Ohio St.L.J. 788, 794 (1975).

proposition is said to be *Springer v. Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1927). That decision struck down certain sections of acts of the Philippine Legislature which set up committees composed of the President of the Philippine Senate, the Speaker of the House, and the Governor General for the purpose of selecting directors of corporations in which the Philippine Government had an interest. This case involved only the construction of the Philippine Organic Act rather than the Constitution. However, even if the principles announced by the Court are applied to the constitutional issues raised by plaintiffs, the decision does not support plaintiffs' argument. The Court invalidated the act of the legislature because:

> Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; that the case might be different if the additional duties were devolved upon an appointee of the executive. * * *. [277 U.S. at 202, 48 S.Ct. at 482.]

The focus of the decision is that the Act attempts to give members of the legislature a specific power which is not theirs—the power of appointment—for as the court said:

> Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions. * * *. [277 U.S. at 202, 48 S.Ct. at 482.]

Nowhere does the opinion suggest that an "Office" in the sense of article I, section 6, is a collection of "executive" functions. Rather, the decision leaves open the possibility that members of the legislature could even engage in a function sometimes reserved to the executive, under certain circumstances:

> * * * Here the members of the legislature who constitute a majority of the

"board" and "committee," respectively, are not charged with the performance of any legislative functions or with the doing of anything which is in aid of the performance of any such functions by the legislature. [277 U.S. at 202, 48 S.Ct. at 482.]

The legislative veto in the Salary Act does not seek to enforce any law, or appoint any agents to enforce the law, and is a device used in aid of legislation on a matter historically within the legislative power.

■ The weakness of plaintiffs' "Office" argument is found in the reason for the adoption of article I, section 6. This provision was generated out of a fear that corruption would result if the legislature multiplied the number or increased the salaries of public offices for the benefit of its own members.[37] The legislative veto creates no new offices for Members of Congress. We have already suggested that its use does not trench on an executive function.

Similarly, plaintiffs' reliance on *Buckley v. Valeo, supra,* is misplaced. There, the Supreme Court held that since Congress had given the Federal Election Commission such broad enforcement power, Congress was precluded from vesting the appointment power over Commission members in itself. The decision is based squarely on the appointment power being constitutionally lodged in the Executive under article II, section 2, clause 2. Manifestly, Congress has nowhere in the salary Act attempted to exercise the power of appointment.

■ Based on the foregoing discussion, we conclude that plaintiffs' attack on the one-House veto as in violation of the principle of separation of powers, and specifically of the first sentence of article II, must fail.

### E

We end this part III of the opinion by reiterating that the one-House veto present in the Salary Act is a device authorized by article I, section 1, coupled with the neces-

---

**37.** Cooper & Cooper, *supra* note 14, at 500.

sary and proper clause, and that it contravenes neither the broad principle of the separation of powers nor any specific provision of the Constitution. In particular we note that the necessary and proper clause, which has sanctioned the massive delegation of legislative functions over the past century, provides a firm grounding for this legislative veto. Congress plainly felt the need for this veto device, instead of relying solely on the power to override presidential recommendations by a full-fledged statute. In *McCulloch's* phrases, Congress exercised "its best judgment" in the selection of this measure and sought to "accommodate its legislation to circumstances." In the world of reality the mechanism, as we have underscored, was a fair substitute for full bicameral concurrence, did not materially invade the Executive's own sphere, and took due account of the limited presidential participation. It was a permissible accommodation of competing interests, reflecting both an appropriate check by Congress upon the Executive and some check by the Executive upon the action which could be taken by one House alone.[38] To borrow the Supreme Court's language, some 50 years ago, in upholding congressional delegation, this particular one-House veto seems to us to pass the test of "common sense and the inherent necessities of the governmental coordination." *Hampton & Co. v. United States, supra,* 276 U.S. at 406, 48 S.Ct. at 351.

## IV

### Conclusion

Since we have concluded that plaintiffs have failed to state claims which entitle them to recover under the theories set forth in either count I or count II of their petitions, we need not consider other defenses raised by the Government. Accordingly, defendant's motion to dismiss is granted, plaintiffs' motions for summary judgment are denied, and the petitions are dismissed.

NICHOLS, Judge, concurring in the result:

I agree with and join the majority of the court in holding that the plaintiffs are not entitled to judgment and the petitions must be dismissed. But I depart so widely in my reasons as to Count I that I think it better to set them forth separately. This I will do in summary form, since no one is joining me in this statement and nothing I say will be "the law." I divide what follows into two parts, I Jurisdiction, and II Merits, Count I. As to Count II, I join in the court's per curiam opinion.

### I. Jurisdiction

There are two jurisdictional barriers the plaintiffs must surmount. The first is imposed by 28 U.S.C. § 455, as amended (Supp. V, 1975), which prohibits our participation in cases wherein our impartiality might be questioned, with detailed treatment of different classes of disqualification. The second rises from the *Testan* doctrine (*United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)) which will have to be carefully considered hereafter in connection with any claim which is at all outside the usual bread and butter run of our cases.

A. As to 28 U.S.C. § 455. I will be frank to say that anyone might reasonably question my impartiality. However, the disqualification is not jurisdictional, may be waived, and has been waived by both parties, unless it falls under § 455(b). If it does, it cannot be waived. Section 455(b) bars a judge who has a "financial interest" in a party. If that were all there would be no problem because we have only an interest in the issues to be litigated, or some of them, as abstract propositions, not in the parties, and therefore our interest does not come under the definition of "financial interest" in section 455(d)(4). But the statute also bars us if we have "any other interest that could be substantially affected by the

---

**38.** *I. e.,* by proposing no change in pay levels at all the president could compel Congress to pass a statute if it wished to modify pay; the President could also limit the possible extent of change in the absence of a new statute.

outcome of the proceeding," that is, are interested otherwise than in a pecuniary way. This language seems to me hopelessly ambiguous. We are not interested in the outcome of this case, only in the reasons given for that outcome. The reasons just might possibly support a back pay claim by ourselves. If this kind of interest is an interest in the outcome of a case, it trails off into all sorts of remote connections. Thus, a judge sitting on a dispute between a labor union and a manufacturing corporation might have section 455(b) issue interest if he held stock in any other company that employed union labor, members of any other union. I think, rather than leaving issue interest in such uncertainty, the Congress may well have intended that any such issue interest should be dealt with under section 455(a) and thus that the disqualification should be waivable. This may seem like hair splitting and probably is, but hair splitting often is unavoidable in any attempt to determine the boundaries of Court of Claims jurisdiction.

If section 455(b) is fatal to my jurisdiction, it is fatal to that of all other active and senior judges of this court and that of any other Federal judge who might sit here by designation. Thus, as plaintiffs have presently stated their claim, they would have no tribunal in which they could enforce it if valid, though it is largely founded on the Constitution. It is a common canon of interpretation to read a jurisdictional statute as not barring litigation of a claim of that kind unless the language affords "clear and convincing evidence" that Congress intended that result. *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). To the same effect, in a case closer to us see *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 491, 51 S.Ct. 229, 75 L.Ed. 473 (1931). Thus, for purposes of this case, section 455(b) does not bar jurisdiction, even if, which I do not admit, in some other context, it might do so, for a similar interest. I find it ambiguous in any context. Ordinarily of course, the matter would be resolved under section 455(a) and the ambiguities of section 455(b) need not cause difficulty.

As I read my colleagues, they find an unambiguous bar in section 455 and find in a supposed "doctrine of necessity" the means of leaping over it. The differences from my approach are more than semantic.

The cold truth is that the plaintiffs are suing in the United States Court of Claims under the Tucker Act, 28 U.S.C. § 1491, as amended. They invoke only the powers of this court, such as they are. This court is not an ombudsman. It is a court of severely limited jurisdiction. It can take cases only against the United States, only if they seek money judgments, and only to the extent Congress has waived sovereign immunity. Where money damages are not claimed, Congress has recently enacted a most sweeping waiver of immunity, Act of October 21, 1976, Pub.L. 94–574, 90 Stat. 2721, but where money is claimed, existing waivers are limited and narrowly construed, leaving large categories of possible claims not provided for. The decision whether a claim is consented or unconsented is frequently a matter of legal hair splitting courts would be ashamed of in any other context. For example, by recent authoritative decision, *United States v. Hopkins,* 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976), a contract employee of an unappropriated fund agency can sue for back pay, if deprived of it by legal wrong, but one appointed and enrolled in the ordinary noncontractual way cannot. There is no reason for this distinction. It is simply a matter of defective statutory draftsmanship. Someday, probably, it will be corrected.

To me it seems absurd for a court having such limited jurisdiction to invoke a "doctrine of necessity," saying we must override an unambiguous statutory bar because if we do not, the poor fellows have no remedy. If they have none, they only join a club that has many other members.

The "doctrine of necessity" to my mind exists only for courts of general jurisdiction and cannot be availed of to override unambiguous jurisdictional limits. If, however, section 455(b) is conceded to be ambiguous, the "doctrine of necessity" becomes only a

minor aspect of the general rule stated in *Califano* and in other cases cited therein.

B. The *Testan* Doctrine. The next problem, as I see it, is also jurisdictional. It is a venerable maxim of our jurisprudence that no one can sue for the salary of a position, except a salary actually fixed by law as the salary of a position he actually holds, or held until unlawfully removed. The reasons given for this rule are various. In *United States v. Testan, supra,* it is imputed to the absence of any expression of intent by Congress that the United States shall be liable to pay the money when that is not expressed in legislation, outside the Tucker Act, such as the Back Pay Act, 5 U.S.C. § 5596(b). This must exist as a jurisdictional prerequisite to suit in the Court of Claims, entirely apart from whether legal rights have been breached, or wrongs committed, that might be remedied in some other way. The problem commonly arises, as in *Testan,* in promotion controversies. A claimant to the emoluments of a promotion almost always fails in this court on jurisdictional grounds.

In *United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), it would not have been enough for jurisdiction here if Congress had passed a bill of attainder against Mr. Lovett to bar his appointment or promotion to a position he did not hold. That it sought to deny him a position he already had, or rather the pay of it, would have met the *Testan* test, had it then been articulated.

Though not mentioned in *Testan,* the power of the purse is older than the judicial independence and like it is a safeguard of freedom. Parliaments exercised power of the purse to clip the talons of the Stuart kings when judges were officers of the Royal household, toadies who could be appointed or removed at the Royal pleasure. The ever infamous Judge Jeffries was one of them. To sue the Government for back pay and obtain a judgment involves an infringement on this ancient power unless expressly consented to; hence the *Testan* decision and others before it, where the Attorney General complained on behalf of the Crown (Pres-

ident and Congress) that we had taken a jurisdiction not properly ours. Differences of opinion are possible as to the scope of consent, but none as to the legal impossibility of exceeding that scope once it is determined. And it is wholly an independent question from whether the Congress has violated anybody's constitutional rights. *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).

Applying a *Testan* analysis to the claims before us, the plaintiffs' most plausible theory, under Count I, is that Congress has under Article III a duty to adjust the pay of judges from time to time, to compensate for decline in the buying power of the dollar. This would appear to be very similar to the duty of the Civil Service Commission, involved in *Testan,* to equalize the job classifications of Government employees. Our theory was that on the Commission's performing this duty, plaintiffs would then have a money claim to satisfy jurisdictional requirements. According to the Supreme Court, reversing, a back pay claim here cannot be postulated on the supposition that another body will perform its duty, if Congress has not indicated its intent to found a pecuniary liability on such a supposition. Similarly plaintiffs here do not have a money claim on the mere assertion that Congress should have adjusted their salaries, when Congress has never indicated that any employees, judicial or other, should have a money claim above and beyond the salary fixed by statute. This is a matter wholly independent of whether the legal duty sought to be enforced originates in the Constitution. We cannot bootstrap ourselves into jurisdiction by the equitable doctrine of viewing that as done which ought to have been done.

Plaintiffs, however, also say that their Article III right is "self-executing." This is a very important contention, because the court has apparently adopted it, and if correct it gets us around the *Testan* barrier and opens up the merits for our consideration. In my view, however, the Article III salary right is to an exercise of sound discretion by the Congress, taking into account

the decline in the buying power of the dollar. I do not at all agree Congress is bound, in adjusting salaries, to conform to the changes in the Consumer Price Index. Other options are open. I discuss the nature of the right, as I see it, more fully below. If such a right can be described as self-executing, that of the *Testan* plaintiffs was self-executing too, and the barrier the Supreme Court held to be fatal to our jurisdiction was imaginary. I may say I find an inherent contradiction in the majority designation of the right as self-executing, and the other incidents of the right as attributed to it by the court.

As regards Count II of the petitions, I do not think the *Testan* analysis is fatal to jurisdiction, for the reasons stated in *Gentry v. United States,* Ct.Cl., 546 F.2d 343 (1976). The claim in Count II is founded on a statute, as amended, by deletion of an allegedly unconstitutional proviso. The claim did not require action by anyone other than this court. Hence I agree that the court may properly go into the merits under Count II.

## II. Merits, Count I

The court, having determined that Article III gives a self-executing right, goes on to discuss what the duties of Congress were and are in the premises, and concludes that the neglect of Congress to make cost of living adjustments in judges' pay, if reprehensible, does not rise to the dignity of a constitutional violation. I seem to read between the lines a reluctance to hold that there can be such a thing as a constitutional violation not remediable in any court. The popular view of such matters no doubt is that if you can't sue on it, the Constitution doesn't cover it, much as serious thinkers used in the twenties to say that it was impossible for the Prince of Wales (later King Edward VIII) to be unfashionably dressed. As people see it, a constitutional right is nothing if it is not a successful lawsuit. My view, however, is that constitutional rights can and do exist, and can be breached, even though no court is open for their enforcement. This certainly has oc-curred historically. *E. g.,* in *United States v. Sioux Nation,* 518 F.2d 1298, 207 Ct.Cl. 234, *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), we recognized at least that this court formerly had taken such a view. The Congress has the duty to rectify constitutional breaches not remediable in the courts, or widen court jurisdiction to cover the cases, but cannot be ordered to do either. My colleagues view the possibility of, *e. g.,* a discriminatory failure to adjust for inflation, as to judges only, or a Weimar Republic type of inflation of the money to zero value, as horrors they do not wish to approve as constitutional in advance, and therefore they assert their jurisdiction, get into the merits, and exonerate the Congress of any constitutional violation up to now.

Since in my view we do not have jurisdiction, the added heinousness of any constitutional violation in the premises would not confer it. It is therefore inappropriate for me to hold whether or not there have been violations of Article III rights up to now. However, I think it is at least arguable that Article III confers a right not just to exercise of sound discretion and to nondiscrimination, but also to effective ways and means to implement regular adjustments, for cost of living, in face of the inflation which we have experienced continuously over the entire lifetime of the majority of persons now living, and must expect to continue, checked more or less, perhaps, but never stopped, until all of us are dead. Such a right, if it exists, is frustrated by the unfortunate statutory arrangements (Federal Salary Act, 2 U.S.C. § 351 & *ff.*) which link such adjustments to those proposed for others than judges, and expose them to defeat because of differences about entirely unrelated issues. Also, ordinary legislation, if defeated, can be redrafted to meet the objections of those who cast adverse votes, but under the Act under consideration, there is no provision for this, and an adverse vote halts action for an indefinite period, in 1974 as long as 3 years. I could not, therefore, jurisdiction questions aside, have joined in holding Article III is unviolated up to now. It does not follow,

the Article not being self-executing, that ascertaining the damages would have been easy, and it could be they would have been nominal, particularly with respect to plaintiffs whose pay when they first entered the Federal judiciary did not materially exceed in real buying power the pay actually received during the period sued upon. A further caveat is this: the Federal Salary Act, being in my view an inadequate performance of a duty imposed on Congress by Article III, but some performance as far as it goes, it does not follow that the Act should be struck down, in whole or in part. Such a deletion from the statute book would make it even more out of harmony with the constitution than it is now. A deletion, on constitutional grounds, such as in *Gentry, supra,* makes the remainder of the statute constitutional and thus is a kind of judicial amendment that thrusts in an entirely different direction.

The majority's holding that it has jurisdiction and its review of the statute and performance thereunder I think warrant me in going as far as I have done in my comment on Count I of the petitions.

SKELTON, Senior Judge, with whom KASHIWA and KUNZIG, Judges, join, concurring in part and dissenting in part: *

* Judge Kashiwa and Judge Kunzig collaborated in the preparation and writing of this concurring and dissenting opinion.

1. § 359. Same; effective date

(1) Except as provided in paragraph (2) of this section all or part (as the case may be) of the recommendations of the President transmitted to the Congress in the budget under section 358 of this title shall become effective at the beginning of the first pay period which begins after the thirtieth day following the transmittal of such recommendations in the budget; but only to the extent that, between the date of transmittal of such recommendations in the budget and the beginning of such first pay period—

(A) there has not been enacted into law a statute which establishes rates of pay other than those proposed by all or part of such recommendations,

(B) neither House of the Congress has enacted legislation which specifically disapproves all or part of such recommendations, or

(C) both.

## CLAUSE B PROVIDING FOR A ONE–HOUSE VETO IS UNCONSTITUTIONAL

I concur with and join in all of the majority opinion except that part dealing with Count II of plaintiffs' petitions wherein the majority holds that subdivision (B) of Title 2, Section 359(1) (hereinafter Clause B) which provides for a "one-House veto" is constitutional.[1] I cannot agree that Clause B is constitutional, because in my opinion, the one-House veto which it provides for violates and is contrary to the Constitution and for that reason Clause B is invalid and constitutionally impermissive. The one-House veto violates the following articles of the Constitution: (1) Article I, section I, which vests the legislative power of the United States, *not in one House,* but "in a Congress * * * which shall consist of a Senate and a House of Representatives; " (2) article I, section 7, clause 3, which reserves to the President the power to veto "every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary; " and (3) article II, section I, which vests all Executive power in the President.[2]

(2) Any part of the recommendations of the President may, in accordance with express provisions of such recommendations, be made operative on a date later than the date on which such recommendations otherwise are to take effect. Pub.L. 90–206, Title II, § 225(i), Dec. 16, 1967, 81 Stat. ·644.

2. "Article I, Section 1. Legislative power vested in Congress

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

"Article I, Section 7, Clause 3. Approval or veto of orders, resolutions, or votes; repassage over veto

Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, ac-

Furthermore, the one-House veto violates the principles of the doctrine of Separation of Powers on which our government was founded. It is contrary to the intent of the Framers of the Constitution. They intended that "the powers of the three great branches of the National Government be largely separate from one another." *Buckley v. Valeo,* 424 U.S. 1, 120, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976).

There is much authority for the proposition that the one-House veto is unconstitutional. As early as 1897 the Senate Committee on the Judiciary stated that "every exercise of 'legislative powers' involves the concurrence of the two Houses.[3] This principle was followed consistently until 1939 when Congress began to enact legislation that has allowed one or both Houses of Congress (or committees) to repeal, invalidate, or modify previously delegated authority.[4] President Woodrow Wilson was definitely of the view that such statutes were unconstitutional and openly stated his views to that effect.[5] Every President, beginning with Hoover and including Roosevelt (who wrote an opinion about it), Truman, Eisenhower, Kennedy, Johnson, Nix-

on, and Ford, each supported by his Attorney General, has contended that the one-House veto was unconstitutional.[6]

When President Ford signed the Federal Election Campaign Act, 2 U.S.C. § 431, *et seq.* on May 11, 1976, he stated unequivocally that the one-House veto in the Act violated the Constitution. In this regard he stated:

A more fundamental concern is that these amendments jeopardize the independence of the Federal Election Commission *by permitting either House of Congress to veto regulations* which the Commission as an Executive agency, issues. *This provision* not only circumvents their original intent of campaign reform but, in my opinion, *violates the Constitution.* I have therefore directed the Attorney General to challenge the constitutionality of *this provision* at the earliest possible opportunity. [Emphasis supplied.]

Many Representatives and Senators have expressed the view that the one-House veto was unconstitutional.[7] Senator Dirksen in speaking against a committee veto (which to all intents and purposes is the same as a one-House veto) stated:

cording to the Rules and Limitations prescribed in the Case of a Bill."
"Article II—The President
Section 1. The executive Power shall be vested in a President of the United States of America."

**3.** S.Rep. No. 1335, 54th Cong., 2d Sess. 8 (1897).

**4.** For a collection of those statutes, see Watson, *Congress Steps Out: A Look at Congressional Control of the Executive,* 63 Calif.L.Rev. 983 (1975).

**5.** See messages of President Wilson, 59 Cong. Rec. 7026–27, 8069 (1920), and 58 Cong.Rec. 8074 (1919).

**6.** Wilson: 59 Cong.Rec. 7026–27, 8609 (1920); Hoover: 76 Cong.Rec. 2445 (1933); Roosevelt: H.R.Doc. No. 252, 75th Cong., 1st Sess. (1937); 83 Cong.Rec. 4487 (1938); 90 Cong.Rec. 6145 (1944); Jackson, *A Presidential Legal Opinion,* 66 Harv.L.Rev. 1353, 1357–58 (1953) (Publishing a confidential opinion by President Roosevelt); Truman: 97 Cong.Rec. 5374–75 (1951); 98 Cong.Rec. 9756 (1952); Eisenhower: 10 Cong.Rec. 7135 (1954); 101 Cong.Rec. 10459–60 (1955); Public Papers Of The Presidents Of The United States; Dwight D. Eisenhower at

648–50 (1956); H.R.Doc. No. 255 Pt. 1, 86th Cong., 2d Sess. at M18 (1960); Kennedy: Public Papers Of The Presidents Of The United States: John F. Kennedy at 6 (1964); Johnson: Public Papers Of The Presidents Of The United States: Lyndon B. Johnson, 1963–64, at 861–62, 1249–51 (1965); 1 Weekly Comp.Pres.Docs. 132, 432–33 (1965); 111 Cong.Rec. 12639–40 (1965); Nixon: 8 Weekly Comp.Pres.Docs. 938, 1076 (1972); 9 Weekly Comp.Pres.Docs. 1285–87 (1973); Ford: 10 Weekly Comp.Pres.Docs. 1279 (1974). These statutes have also been the subject of several opinions by the Attorney General. 37 Op.Att'y Gen. 56 (1933); 41 Op. Att'y Gen. 230 (1955); *Id.* at 300 (1957).

**7.** *See, e. g.,* 76 Cong.Rec. 3539 (1933) (Senator Byrnes); 84 Cong.Rec. 2477–78 (1939) (Representatives Taber and Wolcott); 83 Cong.Rec. 3090 (1939) (Senator King); 87 Cong.Rec. 1100, 1245, 1269, 1569, 2063–75 (1941) (Senators Clark, Gillette, McCarran, and Murdock); 87 Cong.Rec. 6504–07 (1941) (Senators Adams and Taft); 97 Cong.Rec. 5443 (1951) (Representative Patman); 100 Cong.Rec. 5095 (1954) (Senator Dirksen). See Watson at 988 (my n. 4.)

Those provisions were unconstitutional then and they are unconstitutional now. It is true that there has been no pronouncement to that effect by the Supreme Court of the United States or by any other competent Federal court. The reason that it is difficult to test the legality of such statutes is found in the fact that, in order for the matter to be presented to the courts, somebody must have standing to challenge its validity.

However, that fact does not make it constitutional. * * * [100 Cong.Rec. 5095 (1954)]

It has been the more or less consistent view of the Attorneys General and the Department of Justice that the one-House veto is unconstitutional. Assistant Attorney General Antonin Scalia, Office of Legal Counsel, Department of Justice, testified to that effect on May 15, 1975, before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary.

*It is very significant and most persuasive that the 140 able, experienced, and knowledgeable federal judges who filed these suits, together with their distinguished attorney former Supreme Court Justice Arthur Goldberg, all of whom are learned in constitutional law, believe the one-House veto is unconstitutional* as shown by the allegations in their petitions and the arguments in their briefs.

The Department of Justice presented arguments attacking the constitutionality of the one-House veto in the recent case of *Clark v. Valeo,* decided January 21, 1977, 559 F.2d 642, by the Circuit Court of the District of Columbia. In its brief in that case the Assistant Attorney General stated:

The fundamental vice of the one-House veto is that it purports to permit lawmaking without participation in the relevant policy choices by both houses of Congress or by the President. [*Id.* at 19–20.]

On one occasion, the Attorney General, in commenting on the interference with the executive power of the President by the use of the one-House veto by either House of Congress, stated:

*It must be assumed that the functions of the President under this Act were executive in their nature or they could not have been constitutionally conferred upon him,* and so there was set up a method by which one House of Congress might disapprove Executive action. No one would question the power of Congress to provide for delay in the execution of such an administrative order, or its power to withdraw the authority to make the order, provided the withdrawal takes the form of legislation. *The attempt to give to either House of Congress, by action which is not legislation, power to disapprove administrative acts, raises a grave question as to the validity of the entire provision in the Act.* * * * [37 Ops. Att'y Gen. 56 (1933).] [Emphasis supplied.]

Attorney General Brownell pointed out that the attaching of invalid conditions to legislation enacted by Congress would gravely jeopardize the constitutional system of the separability of the branches of government. He stated:

The present proviso cannot be sustained on the theory that it is a proper condition attached to an appropriation. It is recognized that the Congress may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted. It may also impose conditions with respect to the use of the appropriation, provided always that the conditions do not require operation of the Government in a way forbidden by the Constitution. *If the practice of attaching invalid conditions to legislative enactments were permissible, it is evident that the constitutional system of the separability of the branches of Government would be placed in the gravest jeopardy.* [41 Ops.Att'y Gen. 23.] [Emphasis supplied.]

In the case of *Clark v. Valeo, supra,* the majority of the court held that the plaintiff did not have standing to maintain the suit and for that reason did not reach the question of whether or not the one-House veto in the statute involved in the case was

constitutional. However, in a very able opinion, Judge MacKinnon held that the plaintiff had standing as a voter to maintain the suit, and stated emphatically that the one-House veto provision in the Federal Election Campaign Act was unconstitutional. He said:

> * * * This case has a lay-over *and a one-house veto.* There is nothing wrong with a lay-over provision, be it 30 days or six months. This can allow Congress to act in a constitutional manner through both houses and the President and that is permissible. *But the one-house veto is not a "difference . . . of degree"— it is a completely different method of accomplishing a legislative result by a congressional procedure not authorized by the Constitution; i. e., by one house instead of by two houses and the President.*
>
> *That the unconstitutional procedure (the one-house veto,* not the lay-over) may *also* influence legislation is not to be equated with the influence or action that Congress may exercise or resort to during a simple lay-over provision. There may be a difference only in degree between the influence of a 30 day lay-over and a six months lay-over, but *there is a radical difference in kind between the the influence of a one-house veto and any simply lay-over provision. The former is invalid, the latter is valid, for the reasons herein outlined.* [Emphasis supplied.] [At 681, n. 4.]

Judge MacKinnon pointed out that under the one-House veto provision, a bare majority of a quorum in the Senate (26 Senators) or a bare majority of a quorum in the House (110 Representatives) could defeat the proposed regulations of the election commission. In this connection, he stated:

> * * * [T]he scheme of the Act makes it possible for a *bare* majority of a quorum (which frequently occurs) in *either house* of Congress to influence regulations constituting *"rules of law,"* while completely depriving the President, possibly one house of Congress, and one-third plus one of the members of each house, from exercising legislative power suppos-

edly vested in them by the Constitution. Short reflection upon the enormity of these constitutional violations will convince anyone of the tremendous harm they cause to the basic procedures that the Constitution provides for the enactment of legislation to govern the Nation. [Emphasis in original] [At 683.]

> * * * * * *

> * * * Such a bare majority is given the power to accomplish what the Constitution otherwise requires of a two-thirds majority in *both* houses. This enhanced legislative authority for a bare majority of a quorum of *one house* to take positive legislative action clearly violates the constitutional requirement that legislation should be passed by both houses and be signed by the President. Art. I, sections 1, 7. The Constitution confers *"All* legislative powers" on both houses and does not permit a single house to usurp the constitutional legislative power of "Congress." [Emphasis in original] [Footnotes omitted] [At 683.]

Although Judge MacKinnon's opinion is labeled a "dissenting" opinion, such is not really the case on the one-House veto question, because the majority did not reach nor decide that issue. Justice White of the Supreme Court, in a one paragraph comment in his concurring opinion in *Buckley v. Valeo,* 424 U.S. 1, 284–85, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), discussed certain aspects of the one-House veto as applied to the peculiar facts in that case, but the opinion of Judge MacKinnon aforesaid is the only decision that has ever been written by an appellate judge that has considered the question in depth on the merits. In my opinion, his decision was correct and should be followed.

Furthermore, the vice of the one-House veto created by Clause B of the Act is compounded by the fact that in exercising such veto by a bare majority of a quorum of either House a small group of Senators or Representatives or even a larger group, can do so *selectively,* that is, they can veto "all or part" of the salary adjustments made by

the President and there is no recourse or appeal from their decision. In this manner they can dictate, change, or rewrite the salary adjustments made by the President. Not even the President has such an "item veto" nor the security that his veto will not be overridden. Such a system ignores and is contrary to the Constitution and the doctrine of Separation of Powers of our Government.

It is significant and very important to note that Assistant Attorney General Lee, who argued the instant case for the Government, *admitted and conceded in open court that Clause B of the Act in question was unconstitutional.*[8] He even stated that if this was a proper case otherwise, nothing would please him more than to have this court hold that Clause B was unconstitutional. In making these statements, admissions, and concessions, he was speaking for the Government. It would seem that as far as this case is concerned, the Government should be *virtually* bound by its admission that the one-House veto is indeed unconstitutional. In 28 U.S.C. § 516 (1970), it is provided as follows:

> Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

In *United States v. California*, 332 U.S. 19, 26–27, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889 (1947), the Court recognized the powers of the Attorney General in the following language:

> * * * It is not denied that Congress has given a very broad authority to the Attorney General to institute and conduct litigation in order to establish and safeguard government rights and properties. * * * [Footnote omitted.]

*See also United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279, 284, 8 S.Ct. 850, 31 L.Ed. 747 (1888); *Kern River Co. v. United States*, 257 U.S. 147, 154–55, 42 S.Ct. 60, 66 L.Ed. 175 (1921); *Sanitary District v. United States*, 266 U.S. 405, 425–26, 45 S.Ct. 176, 69 L.Ed. 352 (1925). Furthermore, it is significant that the position of the Attorney General in a suit against the United States in the Court of Claims is specially dealt with in 28 U.S.C. § 518 (1970) as follows:

> (a) Except when the Attorney General in a particular case directs otherwise, the Attorney General and the Solicitor General shall conduct and argue suits and appeals in the Supreme Court and suits in the Court of Claims in which the United States is interested.

> (b) When the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so.

Although we have received the views of Congress regarding the unconstitutionality of Clause B, we refer to the Court's opinion in *The Gray Jacket*, 72 U.S. (5 Wall.) 370, 371, 18 L.Ed. 646 (1866);

> The court has considered the question whether counsel shall be heard in this cause on behalf of the Treasury Department, and has instructed me to say that in causes where the United States is a party, and is represented by the Attorney-General or the Assistant Attorney-General, or special counsel employed by the Attorney-General, no counsel can be heard in opposition on behalf of any other of the departments of the government.

We have, therefore, given the views of Assistant Attorney General Lee great weight in deciding the question of the unconstitutionality of Clause B.

There is no question that the Constitution authorizes and empowers Congress to fix

---

8. Assistant Attorney General Lee defended the case on inseverability and other grounds discussed *infra*.

the salaries of federal judges.[9] However, this is power and authority that can be delegated to the President or an executive agency. In the instant case, Congress delegated to the President the authority and power to fix the salaries of federal judges by the enactment of the Postal Revenue and Federal Salary Act of 1967 (Act), 2 U.S.C. § 351 *et seq.* This was a valid exercise of legislative power. Once made, such a delegation of power to adjust salaries becomes an executive power, and it remains such until and unless legislation is enacted (by both houses) withdrawing it. *See Matter of Moran v. LaGuardia*, 270 N.Y. 450, 1 N.E.2d 961 (1936). No such legislation was ever enacted.

The majority admits that the Act was a delegation of authority by Congress to the President with reference to the adjustment of salaries, but contend that he only had authority under such delegation to make recommendations to Congress. While it is true the statute speaks in terms of "recommendations," the meaning and intent of the statute was to delegate to the President the power and authority to set and adjust the salaries of judges and not to merely make recommendations. This is clearly shown by the facts surrounding the application of the statute and the fixing of salaries by the President on two different occasions when the salaries set by the President became law automatically without any action whatever by the Congress. In 1967 the salary of district judges was $30,000 and that of judges of courts of appeals was $33,000. In that year the Postal Revenue and Salary Act, 2 U.S.C. §§ 351–61, was passed by Congress. Pursuant to the authority delegated to him in the Act by Congress, the President fixed the salary of district judges at $40,000 and that of courts of appeals judges at $42,500 and submitted these adjustments to Congress. The Congress did

nothing whatever regarding these salary adjustments, and, accordingly, they became law on March 15, 1969.[10]

Again, on January 17, 1977, the President acting under the authority delegated to him in the Act by Congress, fixed and adjusted the salary of district judges at $54,500 and that of courts of appeals judges at $57,500, and on that day submitted such adjustments to Congress. Again, the Congress did nothing and these salary adjustments became law on March 1, 1977.[11]

The foregoing 1969 and 1977 adjustment of the salaries of judges by the President, which became law without Congress doing anything about them, is convincing proof that these salary adjustments were not mere "recommendations" by the President to Congress, but were the exercise of executive functions pursuant to the power and authority delegated to him and conferred upon him by Congress. Had these salary adjustments been mere recommendations, they would have died when Congress did nothing about them, and could never have become law automatically. Actually, these salary adjustments could be said to have the status of regulations issued by the heads of the various departments and other executive agencies of the government pursuant to statutes enacted by Congress. Such regulations have the force and effect of law without any action being taken regarding them by Congress. No one would contend that one House of the Congress could invalidate any of such regulations by a simple resolution.

The one-House veto is legislative in character, and, accordingly violates article I, section I of the Constitution which provides that "all legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." This provision

---

9. Article I, section 9, clause 7 of the Constitution; *Miles v. Graham*, 268 U.S. 501, 508–09, 45 S.Ct. 601, 69 L.Ed. 1067 (1925); and *O'Malley v. Woodrough*, 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289 (1939).

10. The Executive Salary Cost-of-Living Adjustment Act enacted by Congress on August 9,

1975, increased district judges' salaries to $42,000 and that of judges of courts of appeals to $44,600, effective October 1, 1975.

11. While the 1977 adjustments are not in evidence or in the record here, we can take judicial notice of them.

deprives one House of the Congress of the power or authority to enact legislation. All legislation must be passed by both Houses of Congress. Otherwise, not only is article I, section I of the Constitution violated, but also article I, section 7, clause 3, which requires that "every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary * * * shall be presented to the President of the United States; * *" who may approve or veto the same. Obviously a one-House veto in the form of a resolution is not presented to the President for his approval or veto, and the Constitution is again violated.

If it could be assumed *arguendo* that the one-House veto is not legislative in character, then it would have to be a judicial or executive power. Clearly, it is not judicial. If it is neither legislative nor judicial, it is then executive. But neither House nor both Houses nor officials thereof can exercise executive power or functions. *See Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); and *Springer v. Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928). Furthermore, article II, section I of the Constitution provides that "the executive Power shall be vested in a President of the United States of America." It is clear that if the one-House veto is the exercise of executive power or function, it violates the above article of the Constitution, and violates the principle of Separation of Powers of our government.

The fixing of judges' salaries by the President pursuant to a statute (the Act) enacted by both Houses of Congress that delegated this function and authority to him in the instant case was the exercise of an executive function. As Attorney General Brownell stated in a similar case:

*It must be assumed that the functions of the President under this Act were executive in their nature* or they could not have been constitutionally conferred upon him * * *. [37 Ops.Att'y Gen. 56 (1933)] [Emphasis supplied.]

As stated above, once this executive authority and function to fix judges' salaries had been conferred upon the President and delegated to him by legislation enacted by both Houses of Congress, it could not be withdrawn nor taken from him except by the passage of a law of equal dignity so providing, and enacted by both Houses of Congress. This has not been done in the instant case, and the one-House veto was ineffectual to accomplish this purpose.[12]

*Amici* in this case appear to rely principally upon the so-called "necessary and proper clause" of the Constitution, article I, section 8, clause 18.[13] The broad interpretation they give to this provision of the Constitution would authorize Congress to enact any and all kinds of legislation that suits its fancy so long as it does not conflict with an express provision of the Constitution. But as the plaintiffs point out, Congress can exclude aliens, but it could not admit aliens on condition that they agree not to exercise free speech. Further, Congress can confer jurisdiction upon the courts, but it cannot confer jurisdiction subject to the condition that judicial decisions must first be approved by the Senate Committee on the Judiciary. In other words, whether Congress can condition a delegation of authority depends upon the validity of that particular condition. This clause of the Constitution does not authorize Congress to ignore the bicameral provision of the Constitution, nor the necessity of submitting to the President every resolution to which the concurrence of both Houses are necessary, nor the provision that all executive authority is vested in the President. These provisions

---

**12.** Legal scholars have criticized the one-House veto. *See* Ginnane, *The Control of Federal Administration by Congressional Resolutions and Committees,* 66 Harv.L.Rev. 569 (1953); and Watson, *Congress Steps Out: A Look at Congressional Control of the Executive,* 63 Cal. L.Rev. 983 (1975).

**13.** "The Congress shall have power * * * to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

of the Constitution, in effect, prohibit the one-House veto, and the "necessary and proper" clause does not authorize Congress to ignore or transgress these fundamental provisions of our Constitution. No one can contend that the Constitution authorizes the one-House veto. A reasonable interpretation of its provisions points the other way.

### SEVERABILITY

I now move to address the question of severability.[14] The Government agreed during this case that the one-House veto is unconstitutional. However, the Government contends that nonetheless, plaintiffs' case must fail because the one-House veto clause is inseverable from the rest of Chapter 11, Title 2, U.S.C.

*Arguendo,* were the majority to agree with the Government that the one-House veto is unconstitutional, (as does the dissent) the question then becomes: Does it follow that the entire Postal Revenue and Federal Salary Act of 1967 must be declared null and void? I believe such a result would be patently ludicrous.

I have argued above that the President's 1973 recommendations for increases in judicial salaries have already taken effect. They are enforceable, provided Clause B is severable from the remainder of the Postal Revenue and Federal Salary Act.

The classic test of severability is whether (1) the valid provisions of the act are capable of standing alone, and (2) the legislature would have intended them to stand alone without the invalid provisions.[15] *Electric Bond & Share Co. v. SEC,* 303 U.S. 419, 433–39, 58 S.Ct. 678, 82 L.Ed. 936 (1938).

After carefully analyzing the arguments of both parties and all amici and having determined that the one-House veto is unconstitutional, I am of the opinion that not only is Clause B a legal nullity, but that it is also severable. It is as if Clause B never existed. The remainder of the Act would then continue in full force and effect, untouched and unchanged by the severance of Clause B.[16]

In determining whether the test of severability is met, courts have applied the rule laid down in *Champlin Refining Co. v. Corporation Comm'n of Oklahoma,* 286 U.S. 210, 224, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932):

> Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law.

*See Buckley v. Valeo,* 424 U.S. 1, 108–09, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1975). *But see Carter v. Carter Coal Co.,* 298 U.S. 238, 312, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). Moreover, the burden of proving inseverability is on the party claiming it. *Moore v. Fowinkle,* 512 F.2d 629, 632 (6th Cir. 1975).

**14.** In *Gentry v. United States,* No. 312–74 (Ct. Cl.1976), 546 F.2d 343, this court adopted the practice of considering severability before constitutionality in cases such as the instant one "because of the nature of this court's jurisdiction." At 347. In the instant case, since I would hold Clause B severable, and the remaining portion mandates payment, *(see infra)* no jurisdictional problems are raised. For the convenience of the reader, then, I treat constitutionality and severability in the "normal" order.

**15.** When considering the severability of a statutory provision, the issue generally centers on whether the Act, of which that provision is a part, would have been enacted absent the constitutionally infirm provision. In its briefs, the Government argues that the one-House veto provision under consideration is not severable

from the remainder of "Chapter 11, Title 2, U.S.C.," as if "Chapter 11" were the *Act* of which the veto provision is a part. Quite simply, Chapter 11 is *not* an Act of Congress. It is merely a *codification* (2 U.S.C. §§ 351–361) of a *part of an act.* Chapter 11 is § 225 of Public Law 90–206: The Postal Revenue and Federal Salary Act of 1967, 81 Stat. 613 *et seq.* 2 U.S.C. § 359(1)(B)—the unconstitutional provision under consideration—is § 225(i)(1)(B) of that Act. It is referred to as Clause B for the sake of convenience. What is significant, however, is that § 225 ("Chapter 11") is not a separate act, but merely a part of Pub.L. No. 90–206.

**16.** It is, of course, unnecessary for the majority to reach the question of severability since it holds the one-House veto to be constitutional.

A brief recitation of the parties' arguments in re severability will set the stage for the discussion of the issue.

Defendant argues that the absence of a severability clause in the Act at bar creates a presumption of nonseverability. Second, defendant contends that the legislative history would indicate Congress would have voted down the entire Postal Revenue and Federal Salary Act had it not contained the one-House veto (Clause B). Third, defendant says that removing Clause B would "end" Congressional control of judicial salaries.

Plaintiffs dispute the existence of a presumption in favor of nonseverability in the absence of a severability clause. Second, they maintain that the legislative history of the 1967 Act proves that the major issue was whether Congress should or should not delegate authority to set *Congressional* salaries, not judicial. Plaintiffs argue that Congress would not have killed the entire bill if the one-House veto clause had been excised, noting the comparatively minor importance it seemed to be given by the legislators.

Third, plaintiffs contend that Congress was perfectly willing to delegate authority to the President (advised by a commission) to set Government salaries without retaining veto power. Plaintiffs argue that this willingness counters the Government's assertion that Congress viewed the existence of the one-House veto clause as essential. Plaintiffs further note that Congress retained other checks on the exercise of its delegated power—thereby not "ending" Congressional control of judicial salaries.

In sum, plaintiffs' argument is aimed at convincing the court that the provisions of the Act (all but Clause B) *are* capable of standing alone, and that Congress would have intended them to stand alone. The Government maintains the opposite proposition.

### 1. Effect of the Absence of a Severability Clause

Defendant's principal argument seems to be that the absence of a severability clause here creates a presumption of nonseverability. Prior to the 1920's, the law on this matter was clear. Throughout the Nineteenth Century, the courts excised unconstitutional clauses from statutes, assuming, in view of the general presumption in favor of constitutionality, that "full effect will be given to such [provisions] as are not repugnant to the Constitution." *Bank of Hamilton v. Dudley*, 27 U.S. (2 Pet.) 492, 526, 7 L.Ed. 496 (1829). *See Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 208, 4 L.Ed. 529 (1819); Stern, *Separability and Separability Clauses in the Supreme Court*, 51 Harv.L.Rev. 76, 79 (1937) and cases there cited. Robert Stern (the subject's leading commentator) wrote of this early period:

> [Whether or not a statute contained a severability clause] the courts were very reluctant to invalidate an entire law on grounds of inseparability. Doubts were resolved in favor of the severance of legislation; indeed, in a number of cases, in both state and federal courts, it was apparently assumed that laws were intended to be sustained to the extent they could possibly be held valid. Although the language of presumption was not employed, it is clear that the courts at that time presumed that laws were intended to be severable, rather than the contrary.

*Id.* at 81.

During the 1920's and 1930's, the Court began to suggest that the presence or absence of a severability clause in a statute led to a presumption of severability or of inseverability.[17] These presumptions, and the cases involved, were examined with care by Robert Stern in 1937.

He concluded that first, the Court decisions on severability very much reflected

---

**17.** *Electric Bond & Share Co. v. SEC*, 303 U.S. 419, 434, 58 S.Ct. 678, 82 L.Ed. 936 (1938); *Carter v. Carter Coal Co.*, 298 U.S. 238, 312, 56 S.Ct. 855, 80 L.Ed. 1160 (1936); *Railroad Retirement Board v. Alton Railroad Co.*, 295 U.S. 330, 362, 55 S.Ct. 758, 79 L.Ed. 1468 (1935); *Utah Power & Light Co. v. Pfost*, 286 U.S. 165, 184, 52 S.Ct. 548, 76 L.Ed. 1038 (1932).

the justices' views on the merits of the constitutional claim. After examining the cases, Stern wrote of severability that:

[T]he Court is free to decide each case the way it pleases without having its discretion fettered by any restraining doctrine. * * * [T]he Court can easily hold any statute separable or inseparable, as it chooses. *Id.* at 111.

In this regard, it should be noted, that language about a "presumption of inseverability" began to appear at a time when the Supreme Court reached out to strike down many New Deal legislative programs in their entirety as unconstitutional. *See, e. g., Carter v. Carter Coal Co.,* 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936).

Stern found, secondly, that Court statements about a "presumption of inseverability" were uniformly *dicta,* saying:

[T]hese presumptions have only been availed of by the Court in construing statutes containing a separability clause . . . .. The converse presumption of *indivisibility* . . . has not yet been given application.

*Id.* at 119.

Despite defendant's arguments, no more recent cases have been found giving effect to the so-called presumption. In all cases that defendant cites, the "presumption" of indivisibility is *dicta,* for a separability clause was present.

Stern found, thirdly, that it was wrong to jump from the absence of a severability clause in a statute to a "presumption" of inseverability:

What has been said in no way indicates, however, that the presumption of *indivisibility* is justifiable. This presumption that, in the absence of a separability clause, laws are to be presumed incapable of separation can only be defended on the ground that legislatures avail themselves of separability clauses whenever they desire the provisions of a law to be severable, and fail to use the device only because they have a contrary intention. Whether legislatures exercise such nice discrimination is very doubtful. Separability clauses have probably been em-

ployed when and because the draftsmen of a statute had doubts as to whether the courts would sustain the law *in toto.* The absence of such doubts, or careless draftsmanship, are more likely than the existence of an intention that the law be treated as inseparable to be responsible for the failure to incorporate such provisions in a statute.

*Id.* at 125.

Fourth, the earlier attitude, assuming:

[T]hat statutes were separable and that valid parts should stand unless the contrary was clearly shown, . . . would clearly seem to be the proper one; the courts should attempt to effectuate rather than to thwart legislative policies. The established—if often forgotten—presumption of constitutionality and the related doctrine that a statute should be given a constitutional construction in order to sustain it, provide close analogies.

*Id.* at 120.

Finally, Stern felt that given the press of events on legislative calendars, it would be unwise and impractical to force a legislature to reenact those portions of a statute that are not constitutionally infirm.

Stern's article has been quoted at length because it not only indicates the historical antipathy towards presuming inseverability in legislative enactments, but it appears to reflect accurately the present state of the law. Since 1937, the "presumption of inseverability" has not been often used or even mentioned. In *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), for example, Jackson, as appellee, cited *Electric Bond & Share Co. v. SEC, supra,* trying to invoke what he termed the "settled presumption against severability where there is no severability clause." The Government refuted Jackson's effort to use such a presumption, arguing that unless the legislature would not have enacted the statute as a whole absent an offending provision, the offending provision may be deleted and the remainder is left, fully operating.

The Court in *Jackson* (a case without a severability clause) accepted the Solicitor

General's argument and went further in undermining any presumption of inseverability. The Court wrote:

The appellees correctly note that *Champlin* was a case where Congress had included a clause expressly authorizing the severance of any invalid provision, a fact upon which this Court relied in recognizing "a presumption that, eliminating invalid parts, the Legislature would have been satisfied with what remained . . . ." 286 U.S. 210, 235 [52 S.Ct. 559, 565, 76 L.Ed. 1062]. But whatever relevance such an explicit clause might have in creating a presumption of severability, see *Electric Bond & Share Co. v. Comm'n*, 303 U.S. 419, 434 [58 S.Ct. 678, 82 L.Ed. 936], the ultimate determination of severability will rarely turn on the presence or absence of such a clause. Thus, for example, the Court in *Champlin*, after stating the basic test quoted above, cited cases in which invalid statutory provisions had been severed despite the absence of any provision for severability. *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 635 [15 S.Ct. 912, 39 L.Ed. 1108]; *Reagan v. Farmers' Loan & Trust Co.*, 154 U.S. 362, 395–96 [14 S.Ct. 1047, 38 L.Ed. 1014]; *Field v. Clark*, 143 U.S. 649, 695–96 [12 S.Ct. 495, 36 L.Ed. 294].

*United States v. Jackson*, 390 U.S. 570, 585, n. 27, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138.

In the recent case of *Tilton v. Richardson*, 403 U.S. 672, 683–84, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790 (1970), the Court went still further, dealing with the question of severability in the absence of a severability clause as follows:

To this extent the Act therefore trespasses on the Religion Clauses. The restrictive obligations of a recipient institution under § 751(a)(2) cannot, compatibly with the Religion Clauses, expire while the building has substantial value. This circumstance does not require us to invalidate the entire Act, however. 'The cardinal principle of statutory construction is to save and not to destroy.' *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 [57 S.Ct. 615, 81 L.Ed. 893] (1937). In *Champlin Rfg. Co. v. Commission*, 286

U.S. 210, 234 [52 S.Ct. 559, 76 L.Ed. 1062] (1932), the Court noted:

'The unconstitutionality of a part of an Act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'

Nor does the absence of an express severability provision in the Act dictate the demise of the entire statute. *E. g., United States v. Jackson*, 390 U.S. 570, 585, n. 27 [88 S.Ct. 1209, 20 L.Ed.2d 138] (1968). (emphasis added)

In the still more recent case of *Buckley v. Valeo*, 424 U.S. 1, 108–09, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Court excised unconstitutional portions from a statute without apparent regard to whether or not a severability clause was applicable. The Court referred to the above-cited language from *Champlin Refining* and no more.

Severability clause or not, *Champlin Refining* states the basic law: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not," the clause is severable. Such a rule makes good sense for the reasons Stern pointed out. Even in the absence of a severability clause, *Champlin Refining*, at the least, imposes upon the Government the burden of showing that "it is evident" that Congress would not have enacted the entire Postal Revenue and Federal Salary Act of 1967 had it known the one-House veto clause would be held invalid.

Finally, this court's decision just a few months ago, in *Gentry v. United States*, No. 312–74 (Ct.Cl.1976), 543 F.2d 343, provides further authority for discounting the Government's argument that there exists a presumption against inseverability.

Thus it seems clear, and I would so hold, that there is no automatic presumption of inseverability just because of the absence of a specific severability clause.

### 2. The Legislative History

The defendant argues further that the legislative history indicates Congress would have voted down the entire Postal Revenue and Federal Salary Act of 1967 had it not contained the one-House veto. To this proposition, plaintiffs offer strong objection.

Plaintiffs maintain that *Champlin Refining* imposes upon the Government the burden of showing that "it is evident" that Congress would not have enacted the Postal Revenue and Federal Salary Act of 1967 had it known the one-House veto clause would be held invalid. Yet it is far from "evident" that Congress would have voted down the Act—without Clause B.

A reading of the entire legislative history [18] shows that the one-House veto had little importance in the debate. Rather, the major issue concerned the creation of a salary commission—*i. e.,* whether or not Congress should delegate, if at all, the power to set Congressional salaries. The House strongly favored the idea—the Senate strongly opposed it. At the last minute the Senate gave way (in return for concessions on junk mail rates under other provisions of the same Act.) [19] The major Senate concern was that Members of Congress stand up and be counted when their own salaries were at issue. This concern was met adequately in other ways.[20]

The Government has culled from the debates those comments showing support for Clause B. That such comments appear in the record is hardly surprising; after all, Congress voted for an Act which included this provision. The issue, however, is *not* whether some Congressmen favored it, or even that it was voted for, but whether it was *essential* to secure passage of the Act. The comments that the Government quotes fail to make this showing.

First, an examination of the Government's citations to the legislative history in the House of Representatives is in order. None of the remarks quoted by defendant suggest that Clause B is essential to meet any of the objections raised to § 225, much less necessary to insure passage of the Act. Mr. Udall [21] suggests in those remarks that fears of discriminatory behavior by the President, raised by Mr. Gross,[22] are implausible (which they are), involve unconstitutional action by the President (which they probably do), and *in any event,* the Congressional veto weapon is available. Nor do any of the quoted comments suggest that Clause A would not give Congress the "final gun." In fact, neither Mr. Udall nor anyone else distinguished between a one-House veto (Clause B) and a bill that passes both Houses (Clause A). Mr. Udall, for example, states:

> The final gun will always be in the hands of Congress. We can always adopt *language or a statute* inconsistent with what the Commission decides. 113 Cong.Rec. 28643.

Indeed, why should anyone have cared strongly about the difference? The issue was Congressional salaries; it is politically inconceivable that the President would try to force a salary increase upon a Congress that had voted for a bill rejecting it.

The comments in defendant's brief offer slim grounds for finding that the House of Representatives felt that Clause B was an *essential* part of § 225, and offer no basis for the proposition that this minor provision was needed to secure passage of Pub.L. 90–206.

---

**18.** The relevant reports are contained in the Appendix to Plaintiffs' Summary Judgment Brief. Excerpts from the floor debates are contained in attachments to that brief and to defendant's main brief. The floor debates are reported in their entirety at the following pages of 113 Cong.Rec.: 27288, 28406, 28409, 28411, 28612, 28641–4, 28672, 28879, 33590, 33972, 34013, 34014, 34022–3, 34212–5, 34220–2, 34236, 34241, 34255, 34261, 34410, 35524, 35811, 35822, 35839–41, 36088, 36100–8.

**19.** 113 Cong.Rec. 36102.

**20.** In particular, by means of the Byrd Amendment, Clause A, and striking language from the House version. *See* discussion, *infra.*

**21.** Honorable Morris K. Udall (2d Dist., Arizona).

**22.** Honorable H. R. Gross (3d Dist., Iowa).

Turning now to the legislative history as evidenced by the Senate, it is again apparent that the Government has simply culled those comments from the debates that speak favorably of Clause B. A scrutiny of the entire debate in the Senate, however, shows that Clause B was not essential to meet any major concern expressed during that debate.

The Senate was hostile to any delegation of Congressional salary authority. Its major concern was that legislators would thereby avoid standing up and being counted as for or against increases in their own pay. To delegate the power to set pay might allow legislators to escape the responsibility.

This expressed concern was met in two ways. First, an amendment by Senator Byrd[23] was passed to the Reorganization Act which thereby allowed the Senate to consider part of any matter before it and to vote on each part separately. This amendment would prevent Senators from hiding a vote increasing their own pay by voting generally on the subject (113 Cong.Rec. 36100, 36101). Second, the Senate/House Conference removed from § 225 the power to set "expenses and allowances, and requirements, conditions, and related matters." This excision was designed to prevent a Senator from hiding a vote for a salary increase by voting for a wage/expense package. The basic idea was to single out Congressional wages and force legislators to vote on them directly. This need was met adequately by the provisions for delaying the effectiveness of the President's recommendation together with the Byrd Amendment and Clause A. Clause B is not essential.

Of course, it might be argued, from a political point of view, that the Senate strongly opposed delegation and nearly *anything* increasing the scope of the delegation would have led to the Act's defeat. Indeed, the Government's argument is plausible only insofar as it implicitly draws upon such an assumption. Yet, the legislative history does not support this view. Moreover, to use this political speculation to support a conclusion of inseverability (instead of analyzing whether Clause B was essential to the passage of the Act as a whole) would be contrary to established law on this issue. It would make the question of severability turn, not on the relation of a clause to the legislative scheme (*i. e.,* if it is *essential* to the passage of the Act), but on the closeness of the vote—on political considerations within the legislature, the actual facts of which (quite properly) remain unknown to a reviewing court.

The absurdity of this result (striking down the entire Act due to Clause B's unconstitutionality and argued inseverability) dictates that the basic question to be asked in determining severability is not a political one, but a legal one: Whether Clause B was essential to the basic purposes of the Act's supporters. The presence of Clause A, the Byrd Amendment, the delay before the President's recommendations take effect, together with the legislative history (showing that the basic argument was about delegation itself and the need for legislators to reveal publicly their positions on legislative salaries), all suggest that Clause B was not essential.

I believe that the legislative history shows nothing to indicate that subsection (i)(1)(B) of Section 225 was in any respect essential to the passage of the full Act, Pub.L. 90–206. If it shows anything, it is that § 225 (and the commission concept embodied therein) was far more critical to the passage of Pub.L. 90–206 than was Clause B to the passage of § 225. In explaining why the Senate/House Conference Committee version of the bill contained § 225, Senator Monroney[24] stated to his colleagues:

> May I say that from the first day until the last day, and almost every hour on the hour, the conferees on the House side tried to keep the junk mail rate at a lower rate . . . *They also insisted*

**23.** Honorable Harry F. Byrd, Jr. (Virginia).

**24.** Honorable A. S. Mike Monroney (Oklahoma).

*on the House Passed version of the Presidential Commission.* We were just as adamant. In fact, . . . I was reminded of the old law of physics that . . . when an irresistible force meets an immovable object, something has to give. Up to the last five minutes I can say advisedly that the House position was unanimous for the junk mail rate they had put in and the Senate position was unanimous in having this commission taken out. We got to such a trading point on the junk mail that to get a bill or not rested on whether we had to lower junk mail rates . . . The House conferees gave in on that and they gave in on the striking out the objectionable language that . . . would force us to vote for the whole package [the Byrd amendment to the Reorganization Act]

. . .

The conference committee was within 5 minutes of a breakup, of picking up our papers and walking out, and there would have been no pay increase for the 3 million Federal workers, including members of our own staffs and for the widows and orphans of those who die between Christmas and 2 months later, when we might resume the conference. *It was the only way, as I said before; it was the only way to give when an irresistible force was colliding with an immovable object.* (113 Cong.Rec. 36102) (emphasis added)

Thus, if the Government is right in believing that the politics of the situation were such that, without Clause B, there would have been no commission, it is even more plain that without the commission, there would have been no Postal Revenue and Federal Salary Act of 1967 (and, in particular, no increased rates for junk mail).

To hold that Clause B is inseverable is to believe that Congress would rather have had the entire Act struck down than to have it remain without the Clause. Given the consequences of each of these alternatives, it is difficult to believe that Congress would have preferred the former. To risk having the entire Act struck down is to risk casting a legal shadow over the paychecks previously sent to many thousands of postal employees (and possibly over postal rates as well).

In view of the known Constitutional doubts about one-House vetoes, Congress could not have preferred the above mentioned risks to a holding of severability. I see little merit in defendant's argument that legislative history would indicate that Congress would not have intended the valid provisions of the Act to stand alone without the invalid provisions.

### 3. Removal of Congressional Control

The defendant says that removing Clause B would "end" Congressional control of judicial salaries. The answer is brief and clear. Plaintiffs emphasize that any excising of Clause B from the Act leaves Clause A intact and operative. They are correct. 2 U.S.C. § 359(1)(A) reads:

[Recommendations of President . . . effective . . . but only to extent that . . .] (A) There has not been enacted into law a statute which establishes rates of pay other than those proposed by all or part of such recommendations . . . .

The Constitution would not protect the judicial salary recommended by the Commission and the President until after Congress had an opportunity to pass a bill in accordance with the procedure legally provided by Clause A. Thus, even absent Clause B, Congress still maintains its control over judicial salaries. Defendant's argument cannot be upheld.

### 4. Congress's Willing Delegation

Plaintiffs, in the course of disputing the Government's contention that the existence of the one-House veto clause was essential to the passage of the Act as a whole, point out that Congress has proved perfectly willing to delegate authority to the President (advised by a commission) to set government salaries without retaining veto power. In the Federal Pay Comparability Act of 1970, 84 Stat. 1946 (codified in 5 U.S.C. § 5305 (1970)), Congress provided that if the

President's salary recommendations for general schedule civil servants—the vast majority of all civil servants—are the same as those of the advisory commission, they will take effect without Congressional review.

For the past six years, automatic annual increases in the salary levels of most federal employees have been provided through Executive action alone under the Federal Pay Comparability Act of 1970, *supra*. In 1975, this benefit was extended to all remaining federal employees, including judges, through enactment of the Executive Salary Cost-of-Living Adjustment Act.[25] Except for the power lawfully to enact a statute effecting rates of pay (which Congress may do pursuant to § 359(1)(A)) and the power to refuse to appropriate (which cannot constitutionally be exercised as to federal judges' salaries in light of Article III, Section 1), Congress has shown a clear willingness to yield its authority regarding federal salaries. Thus, the basis alleged by defendant for holding § 359(1)(B) unseverable is without substance.

The recent 1977 pay raise in the salaries of federal judges (among others) is an example of Congress's willingness to delegate its authority regarding federal salaries. This pay raise, discussed *supra*, went into effect unchanged by Congress. The Commission's recommendations were lowered by the President and his recommendations took effect, per the statutory scheme, without intervening action by Congress. If, as Senate amicus maintains, Congress had not intended to "yield its authority" in this matter, Congress has not manifested such intent.

### 5. Summary

I feel that this court might well be guided by the way in which other one-House veto provisions have been treated. Although there are no judicial decisions directly on point, the actions of the Executive branch provide highly relevant precedent for the following reason:

Many Bills containing one-, or two-House vetoes have been enacted into law over the signature of a President who believed that such a clause was unconstitutional. Before signing such a bill, the President would have had to determine the severability question. If the clause was, in the President's view, severable, the President would be signing an act that was in itself constitutional, but which contained *one* unconstitutional clause. It would be reasonable to sign such a bill despite the offending provision. If the clause were not severable, however, the President would have had to consider signing a bill which he would believe unconstitutional in its entirety. It is unlikely that a President would sign such a bill.

One wonders why President Johnson (who, like other Presidents, believed that one-House vetoes were unconstitutional),[26] would have signed the Act here at issue into law unless he believed that Clause B was severable, for it seems unlikely that he would have signed this Act believing that the Act was unconstitutional in its entirety.

In summary, I am of the opinion that the valid provisions of the Act are capable of standing alone. The legislature would have intended them to stand alone without the invalid provisions. The burden of proving inseverability is on the party claiming it; the Government has failed to meet its burden.

I would hold that Clause B is severable.

## JURISDICTION AND PROSPECTIVITY

Two subsidiary points remain to be considered if plaintiffs are to recover.

The first concerns defendant's contention that this court is without jurisdiction due to the absence of a statute that "can fairly be interpreted as mandating compensation by

---

**25.** 89 Stat. 419–423 (codified in various sections of Titles 2, 5, 11, 28, 31, 40, and 44, U.S.C.).

**26.** *See, e. g.,* Pub.Papers: Lyndon B. Johnson, 1963–64 at 861–62: 1 Weekly Comp. of Pres. Doc. 132,432–33 (1965); 111 Cong.Rec. 12639–40 (1965).

the Federal Government for the damage sustained." *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976), *quoting Eastport Steamship Corp. v. United States,* 372 F.2d 1002, 1009, 178 Ct.Cl. 599, 607 (1967). Defendant's position rests principally on the argument that Clause B is not severable from the rest of the Act. If Clause B were not severable, says the Government, upon a further finding that Clause B was unconstitutional, the entire Act would fall, *including* that part mandating payment, 2 U.S.C. § 359(1).[27]

However, since I would hold Clause B severable, *supra,* I find defendant's lack of jurisdiction argument without merit. Absent Clause B, the remainder of the Act still stands, and the pertinent part, now codified at 2 U.S.C. § 359(1), mandates payment. *See United States v. Testan, supra.*

Further, I find no merit in defendant's argument that the court cannot grant relief if a portion of the Act must first be declared unconstitutional. Such a proposition is directly contrary to our holding in *Gentry v. United States,* No. 312–74 (Ct.Cl.1976), 546 F.2d 343, and totally foreign to the jurisprudence of this court. In *Gentry,* plaintiff, an illegitimate minor child, sought benefits under the Civil Service Retirement Act of 1930, as amended. 5 U.S.C. § 8331, *et seq.* (1970). In deciding for plaintiff, the court held the "live-in" requirement of 5 U.S.C. § 8341(a)(2)(A)(ii) unconstitutional and then stated that the remainder of the "statute must be construed, and payments made, without regard to the [unconstitutional live-in] requirement." *Gentry v. United States, supra,* at 354. *See Frontiero v. Richardson,* 411 U.S. 677, 680, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

The second point concerns defendant's contention that, if the court holds the one-House veto unconstitutional and severable (as I would), its decision should be applied prospectively only. The Government thus would deny applicability to these very plaintiffs of a decision favoring recovery in this case. This would be a prospective overruling foreclosing victory to the very parties who originally brought the suit.

The Government would have us hold the one-House veto validly applied against plaintiffs in this case and, thereby, deny them relief. Defendant, then, is urging a certain species of prospective overruling, one that "does not apply even to the parties before the court." *Linkletter v. Walker,* 381 U.S. 618, 621–22, 85 S.Ct. 1731, 1733, 14 L.Ed.2d 601 (1965); *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 422, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Two grounds are asserted for this proposition.

Initially, defendant argues that Congressional reliance on Clause B should preclude the court from applying a decision of unconstitutionality to the instant case. Reliance is found in Congress's use of Clause B to deny effect of the President's 1973 recommended pay raise. Defendant states that Congress's reliance was justifiable, and that to decide otherwise is inequitable. *See Halliday v. United States,* 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969); *Tehan v. United States,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); *England v. Louisiana State Board of Medical Examiners, supra.*

To speak of "Congress's reliance" is to refer only to the fact that Congress, had it known of Clause B's unconstitutionality, might (or might not) have passed another statute. Such is always true when a statute is held unconstitutional. To make such reliance a basis for prospective overruling would make such overruling the norm instead of the exception—undermining a basic distinction between court and legislature.

To argue, as defendant does, that Congress would have used Clause A in 1973 had it known that Clause B would later be

---

27. 2 U.S.C. § 359(1) (1970) reads:

Except as provided in paragraph (2) of this section, all or part (as the case may be) of the recommendations of the President transmitted to the Congress in the budget under section 358 of this title shall become effective at the beginning of the first pay period which begins after the thirtieth day following the transmittal of such recommendations in the budget; . . . .

declared unconstitutional merely states the obvious. I think it would be safe to say Congress would always use a constitutional method of achieving its ends when the alternative is to place reliance on an unconstitutional method. To make the reliance defendant urges the basis for determination of prospectivity would make prospectivity the general rule. But the Supreme Court has stated that neither prospective nor retroactive application is automatic; the effect of a constitutional decision must be determined " 'in each case' by looking to the particular traits of the specific 'rule in question.' " *Johnson v. New Jersey,* 384 U.S. 719, 728, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882 (1966).

Nor do I agree with defendant's prospectivity argument that it would be inequitable in the instant case to apply a holding that Clause B is unconstitutional. Defendant appears to argue that such an application would be inequitable to Congress. In fact, however, to deny plaintiffs relief through a prospective-only decision would cause the greatest inequity. A prospective-only decision would deny relief to the very plaintiffs who brought this suit, and would have the broader effect of discouraging other plaintiffs from challenging unconstitutional statutes.

Moreover, a holding of unconstitutionality should come as no surprise to Congress. The validity of the one-House veto has been the subject of great controversy, both in Government and in scholarly circles. *See* Part I of this dissent, *supra. See also Berger v. California,* 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969); *Roberts v. Russell,* 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968). I would not find Congress's reliance on the supposed constitutionality of Clause B persuasive.

As a secondary argument for prospectivity, defendant contends that plaintiffs should not be allowed to attack a statute as unconstitutional while simultaneously seeking to retain benefits received under it. In the instant case, defendant claims that plaintiffs should not be permitted to challenge the constitutionality of the Act since they received the benefit of a pay increase in 1969.

The Government relies on *Arnett v. Kennedy,* 416 U.S. 134, 152–54, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Opinion of Rehnquist, J.). The opinion, in turn, is based on cases which are clearly distinguishable from the instant situation. For example, cases cited in Justice Brandeis's concurrence in *Ashwander v. TVA,* 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) all appear to involve a situation where plaintiffs attacked an *entire* legislative scheme while seeking to retain benefits conferred by the same legislation. In the case at bar, plaintiffs attack only a single clause of an Act, and the clause has not benefited plaintiffs—to the contrary, it has been used to deny them benefits otherwise available.

Even if defendant's argument were on point, I can find no recent case which upholds it. In fact, defendant's chief authority, *Arnett v. Kennedy, supra,* applies more to questions of standing and justiciability than to the issue of prospectivity.[28] And, *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), presenting an analogous situation to the one at issue here, did not even mention defendant's proposition.

In summary, defendant's argument that the court is without jurisdiction and that its decision should be prospective only are both without merit. I would hold that the court has jurisdiction to decide this case and that its decision should grant plaintiffs the relief they seek.

**28.** Defendant's prospectivity argument appears to be moot in view of the enactment of Pub.L. No.95–19 by Congress on April 12, 1977, which repealed the "one-House veto" provision (Clause B) of the statute involved here, and which requires all future salary adjustments made by the President to be voted on by both Houses. However, the new statute does not affect the instant cases as they are suits for back pay. With relation to the question of justiciability, we reemphasize that we concur with the analysis of the majority at Part "b" of its discussion of Count I, *supra.*

## CONCLUSION

In the case before us, we find that on February 4, 1974, the salary of district judges was $40,000 and that of judges of courts of appeals was $42,500. On that date, after receiving the report of the salary commission which recommended a flat increase of 25 percent, the President, acting pursuant to the authority delegated to him by the Act, as he did in 1969 and 1977, fixed the salaries of such judges by increasing them seven and one-half percent as of March 1974; seven and one-half percent as of March 1975; and seven and one-half percent as of March 1976. These adjustments were sent to Congress by the President on February 4, 1974. Such adjustments set the salary of district judges at $43,000 in 1974, $46,200 in 1975, and $49,700 in 1976, and fixed the salary of judges of courts of appeals at $45,700 in 1974, $49,100 in 1975, and $52,800 in 1976. Notwithstanding the exercise of this executive function by the President, the Senate adopted the following resolution on March 6, 1974:

### SENATE RESOLUTION 293

#### March 6, 1974

Resolved, That the Senate disapproves all the recommendations of the President with respect to rates of pay transmitted to the Congress in the budget for the fiscal year 1975 pursuant to section 225(h) of the Federal Salary Act of 1967.

Congressional Record
Daily Edition at S2899–S2900
March 6, 1974

This resolution operated as a one-House veto, as the House of Representatives took no action. Consequently, the judges have not received the increased salaries as fixed by the President on February 4, 1974, and the salary of district judges remained at $40,000 and that of judges of courts of appeals at $42,500, except for the five percent cost-of-living increase they received October 1, 1975, which raised the salary of district judges to $42,000 and that of judges of courts of appeals to $44,600. Their sala-

ries remained at these levels until adjusted by the President as aforesaid effective March 1, 1977, when the salary of district judges was raised to $54,500 and that of judges of courts of appeals to $57,500.

The resolution (293) of the Senate of March 6, 1974, being a one-House veto of the executive function of the President was a violation of the Constitution and therefore constitutionally impermissive for all of the reasons stated herein, and was totally ineffective in law to invalidate the adjustment of judges salaries by the President. The Supreme Court stated in *Norton v. Shelby County,* 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed. 178 (1886) in considering an unconstitutional statute:

> * * * [I]t confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.

The one-House veto of the Senate by its adoption of Senate Resolution 293, being totally ineffective to invalidate the President's adjustments of salaries, such adjustments became law as they did in 1969 and 1977, and by reason thereof 2 U.S.C. § 359 mandates the payment to the plaintiffs of the back salaries they seek in this case. They have a clear statutory claim to their claims under Count II of their petitions and judgment should be rendered in their favor for the difference between the salaries they received from March 1974, to March 1977, and what they would have received had it not been for the one-House veto by the Senate. I would enter judgment to this effect.

The plaintiffs seek interest on the amounts due them, but this claim must be denied. We held in an exhaustive opinion on this question in *United States v. Mescalero Apache Tribe,* 518 F.2d 1309, 207 Ct.Cl. 369 (1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), that interest cannot be awarded in a claim against the government in non-eminent domain cases unless a contract, treaty, or statute so provides.

Accordingly, I would enter judgment allowing plaintiffs' motion for summary judgment as to Count II and denying it as to Count I, and deny defendant's motion to dismiss as to Count II, but allow it as to Count I, and remand the case to the trial judge to determine the amount due the plaintiffs in proceedings under Rule 131(c).

KASHIWA, Judge, concurring in part and dissenting in part:

In addition to what I have agreed with in Judge Skelton's dissent (joined by Judge Kunzig), I believe that I should add the following additional reasons why I dissent from the majority opinion.

Section 356 reads as follows:

§ 356. *Functions of Commission*

The Commission shall conduct, in each of the respective fiscal years referred to in section 352(2) and (3) of this title, a review of the rates of pay of—

(A) Senators, Members of the House of Representatives, and the Resident Commissioner from Puerto Rico;

(B) offices and positions in the legislative branch referred to in sections 136a and 136a–1 of this title, sections 42a and 51a of Title 31, sections 162a and 162b of Title 40, and section 39a of Title 44;

(C) justices, judges, and other personnel in the judicial branch referred to in sections 402(d) and 403 of the Federal Judicial Salary Act of 1964;

(D) offices and positions under the Executive Schedule in subchapter II of chapter 53 of Title 5; and

(E) the Governors of the Board of Governors of the United States Postal Service appointed under section 202 of Title 39.

Such review by the Commission shall be made for the purpose of determining and providing—

(i) the appropriate pay levels and relationships between and among the respective offices and positions covered by such review, and

(ii) the appropriate pay relationships between such offices and positions and the offices and positions subject to the provisions of chapter 51 and subchapter III of chapter 53 of Title 5, relating to classification and General Schedule pay rates.

Section 358 requires the President to recommend salaries "within the purview of subparagraphs (A), (B), (C) and (D) of section 356 * * *." Section 359(1)(B) allows a disapproval of "all or part" of the A, B, C and D salaries recommended by the President. I have tabulated the following possible partial disapprovals only with relation to raises for C (judicial salaries):

Senate Disapproval
(by affirmative vote)

(1) Disapprove raise A (partial)
(2) Disapprove raise B (partial)
(3) Disapprove raise D (partial)
(4) Disapprove raise AB (partial)
(5) Disapprove raise AD (partial)
(6) Disapprove raise BD (partial)
(7) Disapprove raise ABD (partial)

Although there are seven possible partial disapproval combinations under the above tabulation for instances where C's raises are approved, the total number of possible partial disapproval combinations is 14. This must be multiplied by 2 if I apply the same analysis to possible combinations of House disapprovals. So there are 28 possible combinations of partial disapprovals. On the other hand, there are only 2 possible total disapprovals.

Clearly, a single-house partial disapproval in any combination under the above tabulation is a change of the law. For example, in the above tabulation, in seven instances judicial salaries are raised singly or with A, B or D. So there are 28 possible changes of law without bicameral action and without approval of the President. The majority in its opinion emphasizes "no change in law" and it may be said that "no change in law" is the only basis of the majority's opinion. In each of the 28 instances above mentioned, there is definitely a change in the law. So with the single-house veto unconstitutional in 28 out of 30 possible applica-

tions under the 1967 Act, it is difficult to comprehend why the single-house veto should be valid in 2 out of the 30 applications the majority claims it is constitutional. I submit that since the provision is unconstitutional in 28 out of 30 instances (93 percent), the entire provision is unconstitutional in toto in that it has been held that where a portion of a statute is unconstitutional in the vast majority of its intended applications, and it can fairly be said that it was not intended to stand as valid on the basis of fortuitous circumstances only in a fraction of the cases it was originally designed to cover, the statute cannot be permitted to stand. *Butts v. Merchants & Miners Transportation Co.,* 230 U.S. 126, 33 S.Ct. 964, 57 L.Ed. 1422 (1913); *Dorchy v. Kansas,* 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686 (1924).

Furthermore, as a practical matter, under subparagraphs (i) and (ii) of section 356 above recited (hereafter called the relationship clauses), each part recommended bears a relationship to the other as well as the salaries under the mentioned general classification system. Since the single-house veto clause is *obviously unconstitutional* when there is a partial veto, no single house will use the single-house veto clause for a partial veto but will disapprove the proposals A, B, C and D in their entirety even if it agrees that certain raises are proper and deserving. For example, even if raises for C, B and D are proper and deserving, because a single house wishes not to raise the salaries of its own members a single house will be compelled to veto the raise for A (congressional) and include therewith C, B and D when it does not truly intend to object to raises intended for C, B and D. Thereby C (judiciary), B and D will not receive their respective raises. The validity of a statute, whatever its language, must be determined by its effect or operation. *Ludwig v. Western Union Telegraph Co.,* 216 U.S. 146, 162, 30 S.Ct. 280, 54 L.Ed. 423 (1910); *Henderson v. Mayor,* 92 U.S. 259, 268, 23 L.Ed. 543 (1875); *Wisconsin v. J. C. Penney Co.,* 311 U.S. 435, 443, 61 S.Ct. 246, 85 L.Ed. 267 (1940); *Mountain Timber Co. v. Washington,* 243 U.S. 219, 237, 37 S.Ct.

260, 61 L.Ed. 685 (1917). The practical effect of the unconstitutionality in the case of the 28 instances above mentioned is to defeat the purpose of the relationship clauses and to create a situation where deserving persons such as the plaintiffs in the present case will not be given raises which they deserve because a partial veto cannot be made even though the statute as Congress intended allows it. Because of the obvious unconstitutionality in the 28 out of 30 instances and its adverse practical effect and operation as above illustrated, it is my opinion that the single-house veto clause is unconstitutional in toto.

The majority attempts to differentiate this case by defending its position and the single-house veto clause citing a single case *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). I cannot see the relevancy of that case herein because the Court held that the plaintiffs in that case did not have the requisite of "case and controversy." Plaintiffs in that case brought suit in this court under a special statute conferring jurisdiction on this court regarding the right of certain Cherokee citizens as representatives of the tribe to institute suit in the Court of Claims to determine the validity of Acts of Congress with relation to alienation and other restrictions on lands and funds of the Cherokees. The Court deemed the suit to be equivalent to a bare declaratory judgment suit in that the suit did not assert a property right as against the Government or demand compensation for alleged wrongs because of action upon its part. *Muskrat* is clearly inapposite. The present case involves claims for back pay in dollars and cents. It is not a declaratory judgment suit.

The question of standing to raise constitutional questions was reviewed in *United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). The Court said that recognized exceptions to the general rule were:

(1) Where " * * * rules' rationale may disappear where the statute in question has already been declared unconstitutional in the vast majority of its intend-

ed applications, and it can fairly be said that it was not intended to stand as valid, on the basis of fortuitous circumstances, only in a fraction of the cases it was originally designed to cover. See *Butts v. Merchants & Miners Transportation Co.,* 230 U.S. 126, [33 S.Ct. 964, 57 L.Ed. 1422]. * * * " [At p. 23, 80 S.Ct. at 523.]

(2) Where "* * * this Court can justifiably think itself able confidently to discern that Congress would not have desired its legislation to stand at all unless it could validly stand in its every application. * * * " [At p. 23, 80 S.Ct. at 524.]

(3) Where "* * * as a result of the very litigation in question, the constitutional rights of one not a party would be impaired, and where he has no effective way to preserve them himself, the Court may consider those rights as before it. *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 459–460, 78 S.Ct. 1163, 1170–1171, 2 L.Ed.2d 1488; *Barrows v. Jackson, supra.* * * * " [At p. 22, 80 S.Ct. at 523.]

The Court recognizes *Butts* as an exception. It also recognizes the rule in *Ludwig v. Western Union Telegraph Co., supra.* The rule in *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), is also confirmed.

The majority opinion, however, summarily dismisses these recognized exceptions, citing a 1911 case, *Muskrat.* As I have stated, *Muskrat* is inapposite.

As the Court stated in *Barrows v. Jackson, supra* at 257, 73 S.Ct. at 1035:

* * * Under the peculiar circumstances of this case, we believe the reasons which underlie our rule *denying standing to raise another's rights,* which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied by permitting the damages action to be maintained. * * * [Emphasis supplied.]

There are questions of fundamental rights involved in this case. The rights of plaintiffs and the multitude of Government employees not parties to this case under the basic constitutional provisions involved in the present case present a question equal to *Barrows* and *N.A.A.C.P.* in fundamental rights and national importance.

The holding that the rule of standing is only a rule of practice as the Court held in *Barrows* makes the majority's imposition of the standing rule untenable in this case. By admitting the unconstitutionality of the single-house veto, defendant has completely waived any objection it may have had on the basis of standing. Defendant may waive rights in this court as private parties may. In view of defendant's waiver of a "rule of practice" only, the majority cannot still insist on a nonwaiver. This court cannot prevent parties from taking positions under a "rule of practice." Plaintiffs are entitled to every waiver defendant makes and the court may not arbitrarily deprive plaintiffs of the benefits of such waiver.

I submit the above reasons as additional reasons in support of plaintiffs' position as well as defendant's position that the single-house veto is unconstitutional. Defendant took its position knowing that the Court in *Raines,* as above listed, approved the rule in *Butts.* Defendant cannot complain. But the majority without even discussing *Raines* or *Butts* in effect repudiates both cases and disagrees with the defendant's concession.

The two cases, *Young v. United States,* 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942), and *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the majority cites to evade the admission of unconstitutionality, which the Assistant Attorney General has made in this case, are cases where criminal convictions were involved. The Court stated:

We deal next with the confession of error by the District Attorney for Kings County in No. 63. Confessions of error are, of course, entitled to and given great weight, but they do not "relieve this Court of the performance of the judicial function." *Young v. United States,* 315 U.S. 257, 258 [62 S.Ct. 510, 86 L.Ed. 832] (1942). It is the uniform practice of this Court to conduct its own examination of the record in all cases where the Federal

Government or a State confesses that a conviction has been erroneously obtained. For one thing, as we noted in *Young*, "our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties." 315 U.S., at 259, [62 S.Ct. 510 at 511]. See also *Marino v. Ragen*, 332 U.S. 561 [68 S.Ct. 240, 92 L.Ed. 170] (1947). * * * [392 U.S. at 58, 88 S.Ct. at 1900.]

Therefore, there is a good and valid reason why these stipulations are not binding in criminal cases but such reasons are not applicable to civil cases but such reasons are not applicable to civil cases especially where each claim involves only about $10,500 plus interest, more or less.

The instances which plaintiffs cite in a footnote to their brief in which the Government has changed its views regarding the one-house veto are of no relevance in this case because the admission in this case was made as a matter of record. It was made in open argument before an en banc hearing of this court.

There are instances after instances in this court where the Government has agreed that certain cases are applicable or are not applicable to its position. Defendant's open admission in this case must be interpreted to mean that *Raines* and *Butts* are controlling in this case. There is no other conclusion I can reach.

Therefore, under *Raines* and the three exceptions thereunder, plaintiffs have standing to raise the unconstitutionality of not only the two cases of veto of the entire recommended list but also the 28 instances of partial veto. The loaf (§ 359(1)(B)) in this case is made up of 28 bad slices and of 2 slices which the majority claims are good slices. But the two are so related to the 28 under the relationship clauses (*Butts, Barrows* and *Ludwig*) that I am of the opinion that the whole loaf of 30 slices is bad.